John Pisacano, Appellant, *v.* State of New York, Respondent.

Fourth Department, June 18, 1959.

*Nathan L. Levine* (*Ernest L. Garb* of counsel), for appellant.

*Louis J. Lefkowitz, Attorney-General* (*Jerome Lefkowitz* of counsel), for respondent.

Williams, J. Claimant contends that while he was a prisoner in Attica State Prison from July, 1952 to February, 1954, the prison's medical and administrative staffs failed and refused to furnish him proper medicines and medical treatment and that as the result he suffered aggravation of a pre-existing physical condition of rheumatoid spondylitis. He seeks compensation

from the State because of such aggravation with its consequent pain, suffering and physical damage. The Court of Claims found that the State had not been negligent and dismissed the claim.

The written claim is in very general terms. It asks damages '' by reason of the neglect, refusal and negligence of the State of New York, its Department of Correction and/or State Insurance Fund, in failing to provide medication, medical care and attention to claimant.'' For purposes of simplification, we state at the outset that we find no neglect, refusal or negligence upon the part of the State Insurance Fund and we shall focus our consideration upon the alleged negligence of the medical and administrative staffs of Attica Prison during the period of claimant's incarceration.

In December, 1944, claimant sustained a back injury while engaged in his employment and received workmen's compensation benefits from the State Insurance Fund. An operation consisting of a laminectomy and spinal fusion was performed in September, 1948. In December, 1949, claimant's condition was diagnosed as rheumatoid spondylitis, commonly called Marie Strumpell's arthritis, causing him to be totally disabled temporarily. A course of deep X-ray treatment was recommended.

X-ray therapy did not produce any change in claimant's condition and subsequently he entered a hospital in March, 1952 for medically recommended cortisone therapy. Initially he was given massive doses which were reduced gradually until a much smaller maintenance dosage was attained. Substantial improvement resulted and claimant was enabled to return to work. At the request of his personal physician, the State Insurance Fund recognized the beneficial results of such treatment and agreed to continue the maintenance doses. Claimant's doctor felt that it was very important that such doses be continued and that only in this way could the claimant be rehabilitated.

Claimant, a parolee, was reimprisoned as a parole violator and in July, 1952 became an inmate of Attica State Prison. Upon arrival he was examined by and came under the care of the prison's physicians. The prison health records indicate that he appeared at sick call approximately 28 times after the senior physician became aware of his condition and that aspirin, A.P.C. (a medical compound of aspirin, phenacetin and caffeine) and sodium salicylate were prescribed. In early August, 1952 claimant had advised the senior physician of his experiences with cortisone and had asked repeatedly that it be given him. He also requested X-ray and heat treatments.

Shortly after July, 1952, a series of correspondence was initiated concerning the availability and use of cortisone. On

August 3, 1952, the senior physician of the prison wrote to claimant's attorney that he did not believe the use of cortisone would produce any further improvement but that if claimant should "get a severe flare-up of his arthritic condition it may be considered." Later, in a letter to the State Insurance Fund dated August 25, 1952, this same doctor stated that a severe flare-up had occurred and therefore that he advised that cortisone be administered. He also stated that once cortisone treatments had begun, they would have to be continued indefinitely but that the prison would not pay for the treatment *because of the prohibitive cost*. The testimony shows that the maintenance doses that claimant had been taking would cost about $2 a day. As aforesaid, since early August, 1952, this doctor had known that claimant had previously received cortisone therapy and had demonstrated a physical tolerance for it. On August 28, 1952, Dr. Erdman, one of claimant's personal physicians, who had originally prescribed the administration of cortisone, wrote claimant's lawyer that in his opinion the treatment had to be continued or an acute exacerbation would occur and that it would be progressively more difficult to stabilize the patient's condition.

In a letter to the State Insurance Fund on November 14, 1952, the senior prison physician stated that, in his opinion, the claimant could be greatly benefited by the use of cortisone, that the prison medical staff was in a position to make the laboratory checks which would be necessitated by such treatment, but again he repeated that the prison would not supply it. In a notice of decision dated February 26, 1953, the Workmen's Compensation Board disallowed the request that the State Insurance Fund furnish cortisone on the grounds that no such treatment was required of the Fund while claimant was imprisoned.

On November 5, 1953, this prison doctor again informed the State Insurance Fund that claimant had suffered a flare-up and recommended that a less expensive product called Butazolidin be administered. He stated, however, that the prison was unable to supply that medication and that it would be advisable for the State Insurance Fund to do so because it might reduce the liabilities which would stem from claimant's disability.

Claimant was hospitalized at the prison from November 30, 1953 to December 5, 1953, during which time he was placed in traction and given sodium salicylate. At no time during his 20 months of imprisonment was he given cortisone, Butazolidin, X-ray therapy, heat treatments or any comparable medication or treatment, nor was he allowed to send home for a back brace

which had previously been made for him under the authority of the Workmen's Compensation Board. The prison hospital was not equipped to administer Roentgen X ray.

Following his release from prison in 1954, claimant was examined and treated by Dr. Erdman, who testified that his condition had worsened, he was in great pain, badly bent over, " the whole picture was one of inflammation " and that claimant was practically back to his former condition of 1949 plus an additional involvement of his neck. Cortisone treatment was begun again, and claimant was placed in a plaster spica. The treatment produced substantial relief and the amount of inflammation gradually decreased. Dr. Erdman, however, was unable to attain the former stabilization of claimant's cortisone dosage.

The Court of Claims made detailed findings which generally substantiated the above facts. It was also found that A.P.C. and sodium salicylate were recognized forms of therapy for rheumatoid spondylitis. Finally it was found : " 30. That whether or not Pisacano should have been given cortisone treatment while he was confined in Attica State Prison was a question of medical judgment."

The trial court also made the somewhat inconsistent finding : " 23. That cortisone was not available at Attica State Prison on account of budgetary limitations."

This latter finding could apply equally well to the failure to administer Butazolidin and X-ray therapy.

On the basis of finding No. 30 the trial court found, as a matter of law and fact, that there was no negligence on the part of the State.

From the evidence, it appears clearly that the *only* reason the claimant was not given cortisone or other additional medication and treatment was not because of medical judgment but because of budgetary considerations. This is obvious from the letters and testimony of the senior prison physician. This doctor knew of claimant's former cortisone therapy, its beneficial results, his tolerance for it and that he had attained a maintenance dosage. Nevertheless, he did not prescribe it or certain other beneficial drugs or treatments, and there is nothing in the record to show that either he or the Warden tried to procure adequate drugs or means of treatment. The Warden must have known of this situation, or at least, under normally efficient administration, he should have known.

Sound medical judgment results from a fair and uninfluenced analysis and determination, based only on physical condition

and needs and potential benefits, not on extraneous factors and certainly not on the inflexibility of a budget. Such sound judgment was not exercised in this case.

We conclude that the inference, inherent in finding No. 30 that claimant was not given cortisone or other additional treatments, because the physicians in charge, in their judgment, decided against it, is unwarranted and against the weight of evidence.

Section 46 of the Correction Law reads in part:

" The state commission of correction shall visit and inspect all institutions used for the detention of sane adults * * * and, subject to the direction and control of the commissioner of correction, shall: * * *

" 5. Secure the best sanitary conditions of the buildings and grounds of all such institutions, and protect and preserve the health of the inmates."

The State Prison at Attica is maintained by the Commission of Correction (Correction Law, § 70), and its Warden is appointed by the Commissioner of Correction (Correction Law, § 18).

Said section 46 requires the employment and rendition of commonly and authoritatively accepted modern medical theories and procedures which are reasonably necessary and adequate, unaffected by budgetary considerations. The failure to meet the required standards was administrative as well as medical, although the distinction is not necessarily material.

In *McCrossen* v. *State of New York* (277 App. Div. 1160, motion for leave to appeal denied 302 N. Y. 950) an injured prisoner reported for medical care to the physician in charge. He received no medical or surgical treatment but on the contrary was continued on heavy work. Both the Warden and the physician in charge knew of his plight. He was discharged at the end of his term with a permanently disabled condition. The State did not deny negligence but took the position that the negligence of the physician could not be imputed to the State. This court rejected that theory and stated: " It is also our opinion that the negligence here found was the failure to perform an administrative duty; that the failure to provide medical or surgical care and treatment was neglect of a duty imposed by law." It was stated that the Warden, as well as the physician, was an officer and employee of the State and had clearly failed to carry out the mandate of the Legislature. The court pointed out that the prisoner " was without right or power to help himself."

In a malpractice case, in commenting on the general standards of care which a physician owes to a patient, the Court of Appeals has said: '' Upon consenting to treat a patient, it becomes [the doctor's] duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge. The law holds him liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment. The rule in relation to learning and skill does not require the surgeon to possess that extraordinary learning and skill which belong only to a few men of rare endowments, but such as is possessed by the average member of the medical profession in good standing. Still, he is bound to keep abreast of the times, and a departure from approved methods in general use, if it injures the patient, will render him liable, however good his intentions may have been.'' (*Pike* v. *Honsinger*, 155 N. Y. 201, 209–210.)

Prison physicians owe no less duty to prisoners who must accept their care, than do private physicians to their patients who are free to choose.

A similar sentiment was expressed in the much-cited case of *Spicer* v. *Williamson* (191 N. C. 487). There is a statute in that State somewhat similar to our section 46 of the Correction Law. The court said (p. 490): '' The prisoner by his arrest is deprived of his liberty for the protection of the public; it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.''

The liability of the State for negligence is the same as that of a private individual or corporation, even though the employee in question is a physician. The State was bound to provide proper facilities and competent physicians (*Becker* v. *City of New York*, 2 N Y 2d 226; *Robison* v. *State of New York*, 263 App. Div. 240).

The judgment of the Court of Claims should be reversed and a new trial granted.

All concur. Present — McCURN, P. J., KIMBALL, WILLIAMS, GOLDMAN and HALPERN, JJ.

Judgment reversed on the law and facts and a new trial granted, with costs to the appellant to abide the event.