[No. 1534-3. Division Three. April 1, 1977.]

MICHAEL W. SHEA, *Respondent*, v. THE CITY OF SPOKANE, *Appellant*.

*Frank Hayes Johnson* and *MacGillivray, Jones, Clarke, Schiffner & Johnson,* for appellant.

*Terry W. Martin, Dellwo, Rudolf & Schroeder, Charles S. Dorn,* and *Dorn, Reynolds & Gustafson,* for respondent.

GREEN, J.—Defendant appeals from a judgment entered upon a verdict for plaintiff in the amount of $275,000.

The assignments of error raise two basic questions: (1) What is the liability of a city for the negligence of a jail physician? and (2) Was the jury properly instructed as to the standard of care required of a physician in an action for

malpractice? These questions must be considered in light of the facts that a jury could have found to exist based on the evidence presented.

In December 1968, plaintiff, age 20, was serving a sentence in the Spokane City jail on a conviction for driving while under the influence of intoxicating liquor. His work–release program was revoked on December 16 due to drinking. During the late evening or early morning of December 17–18, plaintiff became nauseated and didn't know whether it was the flu or his nervous stomach. He approached the jailer and asked if there was anything that could be done and "he said there wasn't." Later, plaintiff began to feel worse. He went back to the jailer and asked if he could get one of his tranquilizers that had been taken away from him when he entered the jail. The jailer said, "No." Plaintiff testified he then "asked if [he] . . . could call a doctor to get . . . [him] to prescribe something and he [the jailer] wouldn't let me make a telephone call. . . . He told me to return to the trustee [sic] department, otherwise he said 'we will put you in a padded cell.'" Plaintiff testified that he started back to the trusty department and:

> I got about three–fourths of the way back and started feeling dizzy and I was next to the wall and tried to brace myself against the wall and I went over backwards and landed on my rear end and tail bone.
>
> . . .
> The next thing I remember was I heard someone—I was laying on the floor and someone said I was bleeding from my mouth and I reached up and wiped my mouth and I was bleeding and started to try to move my lower body. There was a lot of pain and I told them I hurt my lower back and a policeman and I believe, there was a trustee [sic], helped me over to a cot and then a couple of policemen came and took me . . . to the elevator . . . and took me to Sacred Heart [Hospital].

He further testified that as they walked to the police car, "I kept saying that my back was hurting." Upon arriving at the hospital, he was placed in a wheelchair and taken into the emergency room.

Plaintiff testified the accompanying officers told the hospital intern that "they felt I was having the 'dt's.'" The intern noted in his written report that plaintiff "had a seizure in jail" and "apparently has been drinking a fifth a day for one and a half—two years . . . had increasing tremulousness and tonight felt neauseated [sic] and then had a seizure. No previous seizure disorder." The intern checked plaintiff's vital signs and did a reflex hammer and tap on various joints. He then telephoned the jail physician. Following his conversation with the jail physician, the intern treated plaintiff for alcoholic withdrawal and instructed the police to return plaintiff to the jail and place him in a padded cell.

Meanwhile, a casualty report was written at the jail stating that:

"At 12:35 A.M., . . . [December 18], . . . Shea [was found] lying in the jail hallway, acting as if to be having a seizure . . . sweating and clammy, but responded with alertness and talked coherently.

Plaintiff was returned to the jail and as he lay in his padded cell, he complained to those that walked by "that my back was killing me." Later, the jail physician examined him in his cell but did not give him a complete physical because:

A detailed medical history wasn't very feasible with a patient in that state; he was disturbed and sweating, very shakey [sic], coarse tremors and wasn't in any condition where a complete medical history would be reliable, or even responsive.

The jail physician's diagnosis was that plaintiff "was suffering from acute withdrawal symptoms from alcoholism." Later that day, the jail physician observed plaintiff through the window of the cell. He testified: "At that time I . . . made a note that he was talking to himself at times and he had early 'dt's.'"

The padded cell had no toilet or water. Plaintiff testified that he asked the jail physician for water, which someone later brought, set down some distance away, and told him

to get up and get it. He stated that when he tried to get up, it felt like "a million volts going through me," and the only way he could get relief was by lying on the floor.

Later that day, the chief jailer, after talking to plaintiff's father, allowed plaintiff to be taken to Angelus Hospital, a center for treatment of alcoholism. At that time plaintiff was incontinent. Included in a tentative diagnosis at Angelus Hospital was "possible spinal injury." A neurosurgeon was called and within 30 minutes diagnosed plaintiff's condition as "recent spinal injury." Plaintiff was removed to Sacred Heart Hospital for X rays which confirmed this diagnosis. The testimony reveals that the injury probably occurred at the time plaintiff fell in the jail. Approximately 42 hours elapsed between the time plaintiff was placed in a padded cell on December 18 after emergency room treatment and the time he was taken to Angelus Hospital. Plaintiff sustained various permanent injuries, including partial and total paralysis.

This action was commenced to recover damages, claiming that plaintiff's injuries were the proximate result of the negligence of the jailers and other city employees, including the jail physician. Judgment was entered on a jury verdict for plaintiff and defendant appeals.

First, defendant contends the court erred in (1) instructing the jury that the City is liable for the negligence of its jail physician,[1] (2) failing to give its proposed instruction that a jail physician is an independent contractor for which defendant is not liable,[2] and (3) refusing to allow the jury to determine whether the jail physician is an independent contractor under another proposed

---

[1]Instruction No. 8: "With reference to the witness, Dr. Harvey, you are instructed that the City of Spokane has a positive duty to provide competent and adequate medical care and treatment for its inmates and therefore, the acts and omissions, if any, of its physician are the acts and omission of the defendant City of Spokane."

[2]Proposed instruction No. 8: "You are instructed that Dr. Fred C. Harvey was what is known in law as an independent contractor, that is, one who contractually

instruction.[3] Defendant argues that its jail physician, acting under a contract and also engaged in private practice, is an independent contractor because the City does not in fact or by right control the manner or means of the physician's practice of medicine at the jail. Therefore, defendant concludes it is not liable for the alleged negligence of its jail physician and, at most, it should only be liable for the negligent *selection* of the physician. Thus, defendant claims the court erred in instructing the jury to the contrary. The issue raised is one of first impression in this state, and there is a dearth of authorities in other jurisdictions.

 In our view, the liability of a city for the negligence of its jail physician depends upon the nature of the duty owed to its prisoners. The City, in operating and maintaining a jail, has a twofold duty: one to the public to "keep and produce the prisoner when required," and the other to the prisoner "to keep him in health and safety." *Kusah v. McCorkle,* 100 Wash. 318, 323, 170 P. 1023 (1918). *See also Fischer v. Elmira,* 75 Misc. 2d 510, 347 N.Y.S.2d 770 (1973); *Pisacano v. New York,* 8 App. Div. 2d 335, 188 N.Y.S.2d 35 (1959). The duty to the prisoner arises because when one is arrested and imprisoned for the protection of

undertakes to perform services for a principal, but who is not subject to the principal's control or right to control as to the manner or means of performing the services, and therefore represents the will of the principal only as the result of the work.

"One who engages an independent contractor is not liable to others for the negligence of the independent contractor."

[3] "The question has been raised whether Dr. Harvey was the agent of the City of Spokane or whether he was an independent contractor. An Agent is a person employed under an express or implied agreement to perform services for another called the principal, and who is subject to the principal's control or right to control the manner and means of performing the services.

"An independent contractor, on the other hand, is one who contractually undertakes to perform services for a principal, but who is not subject to the principal's control or right to control as to the manner or means of performing the services, and therefore represents the will of the principal only as to the result of the work.

"One who engages an independent contractor is not liable to others for the negligence of the independent contractor."

the public, he is deprived of his liberty, as well as his ability to care for himself.

> The duty which defendant owed to plaintiff [prisoner] arose out of this special relationship in which defendant was one "required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection". 2 Restatement Torts, 2d, § 314A(4), p 118.

*Thornton v. Flint,* 39 Mich. App. 260, 275, 197 N.W.2d 485, 493 (1972); *cf. De Zon v. American President Lines,* 318 U.S. 660, 87 L. Ed. 1065, 63 S. Ct. 814 (1943).[4] When a city takes custody of a prisoner, it must provide health care for that prisoner. *Kusah v. McCorkle, supra.* This is a positive duty arising out of the special relationship that results when a custodian has complete control over a prisoner deprived of liberty. The extent of this control is well illustrated in this case by the jailer's denial of plaintiff's request to telephone a doctor. It is evident to this court that the nature of the relationship is such as to render nondelegable the duty of providing for the health of a prisoner. Stated another way, the duty is so intertwined with the responsibility of the City as custodian that it cannot be relieved of liability for the negligent exercise of that duty by delegating it to an "independent contractor" physician. *See Seattle Lighting Co. v. Hawley,* 54 Wash. 137, 103 P. 6 (1909); *Neagle v. Tacoma,* 127 Wash. 528, 221 P. 588 (1923); 2 F. Harper & F. James, *The Law of Torts* § 26.11, at 1406 (1956); 1 E. McQuillin, *Municipal Corporations* § 53.76(b) (3d ed. 1963). It is apparent that the City's duty must go beyond the mere exercise of ordinary care in the selection of a jail physician as contended by defendant. Rather, the City's liability includes the negligence of the jail physician because the duty to keep the prisoner in health is nondelegable.

---

[4] When a seaman is committed by contract to the service of a ship, the ship becomes committed to the maintenance and care of the seaman during the period of voyage. The physician who treats the seaman is engaged in the shipowner's business, and it is the ship's duty that the physician is discharging.

Our decision finds support by analogy in the rationale of cases involving the liability of employers who provide medical care and treatment to their employees. In dealing with this question, several rules have evolved. If medical care and treatment is gratuitously provided to employees, the employer will only be liable for negligence in the *selection* of the physician. *Simon v. Hamilton Logging Co.,* 76 Wash. 370, 136 P. 361 (1913); *Wharton v. Warner,* 75 Wash. 470, 135 P. 235 (1913); *Wells v. Ferry–Baker Lumber Co.,* 57 Wash. 658, 107 P. 869 (1910); *Richardson v. Carbon Hill Coal Co.,* 6 Wash. 52, 32 P. 1012 (1893). However, where the employer derives a profit from, or is under a contractual obligation to provide employees with medical care and treatment, the employer is liable for the physician's negligence, notwithstanding lack of negligence in selection. *Virginia Iron, Coal & Coke Co. v. Odle's Adm'r,* 128 Va. 280, 105 S.E. 107 (1920); *Sawdey v. Spokane Falls & N. Ry.,* 30 Wash. 349, 70 P. 972 (1902). Likewise, if the physician's services are for the employer's own benefit, advantage, or purpose, the employer is liable for the physician's negligence, notwithstanding lack of negligence in selection. *Knox v. Ingalls Shipbuilding Corp.,* 158 F.2d 973 (5th Cir. 1947); *McGuigan v. Southern Pac. Co.,* 129 Cal. App. 2d 482, 277 P.2d 444 (1954); *O'Donnell v. Pennsylvania R.R.,* 122 F. Supp. 899 (S.D.N.Y. 1954). Finally, where the need for medical services is so intertwined with the employer's operational activity as to create a nondelegable duty on the part of the employer to provide the services of a physician to its employees, the employer has been held liable for the physician's negligence without proof of negligent selection. *Sinkler v. Missouri P. R.R.,* 356 U.S. 326, 2 L. Ed. 2d 799, 78 S. Ct. 758 (1957); *Mangrum v. Union P. R.R.,* 230 Cal. App. 2d 960, 41 Cal. Rptr. 536 (1964); *De Zon v. American President Lines, supra.* It becomes evident that only where an employer provides gratuitous medical care and treatment does the independent contractor rule operate to relieve him of liability for the physician's negligence. In all

other cases, courts have avoided the impact of the rule through exceptions.

Therefore, it is not surprising that in discussing the independent contractor rule, authorities in the tort field have reasoned that the exceptions to the rule are so numerous as to "cast doubt upon the validity of the rule", W. Prosser, *Law of Torts* § 71, at 468 (4th ed. 1971); and that "the whole immunity has become suspect and there are those who would do away with it entirely." 2 F. Harper & F. James, *The Law of Torts* § 26.11, at 1403.

■■ We conclude the trial court did not err in giving instruction No. 8 and refusing proposed instructions Nos. 8 and 9. Nevertheless, defendant argues that instruction No. 8 requiring "competent and adequate" medical care is an erroneous standard allowing a jury to find that *any* misdiagnosis or harm is malpractice even absent negligence or improper treatment. Defendant contends that the proper standard is "reasonable and ordinary." However, defendant failed to take specific exception to this terminology at trial,[5] and therefore cannot raise this contention on appeal. *Nelson v. Mueller,* 85 Wn.2d 234, 533 P.2d 383 (1975). Notwithstanding, we find defendant's argument poses a distinction without a difference particularly in light of the other instructions. Instruction No. 3[6] charges that the jury must find the existence of negligence and proximate cause to hold defendant liable, and instruction No. 7 defines neg-

---

[5] CR 51(f): "The objector shall state distinctly the matter to which he objects and the grounds of his objection, specifying the number, paragraph or particular part of the instruction to be given or refused and to which objection is made."

[6] "As may be observed from the Statement of the Issues which I have made to you, the claim of the plaintiff against the defendant is based on its alleged negligence.

"The mere fact, if it be a fact, that damages were sustained as alleged does not of itself entitle the plaintiff to recover. Recovery of damages can only be had by proof of negligence which was a proximate cause of the injury or damage claimed. In other words, negligence cannot be presumed from the mere fact that an injury occurred or from the mere fact that damages were suffered, but it must be found as a fact from the evidence introduced."

ligence as the "failure to exercise that reasonable and ordinary degree of learning, care and skill which is possessed and exercised by the average physician in the practice of his profession." The instructions taken together adequately insure that the jury will base its verdict on negligence, rather than mere nonnegligent misdiagnosis. The jury is presumed to have followed the court's instructions. *State v. Cerny,* 78 Wn.2d 845, 480 P.2d 199 (1971); *Case v. Olwell,* 1 Wn. App. 766, 463 P.2d 664 (1970); *Ketchum v. Wood,* 73 Wn.2d 335, 438 P.2d 596 (1968).

■ Secondly, defendant contends the court failed to adequately define malpractice by refusing to give proposed instructions Nos. 10[7] and 11.[8] We disagree. Although defendant's theory of the case is embodied in the specific language of these proposed instructions, a party is not entitled to any particular phraseology or "to put his argument into the court's instructions." *State v. Birdwell,* 6 Wn. App. 284, 297, 492 P.2d 249 (1972); *State v. Dobbs,* 14 Wn. App. 613, 544 P.2d 134 (1975). The court's instructions Nos. 7,[9]

---

[7]"A physician possessing the requisite qualifications and applying his skill and judgment with due care is not ordinarily liable for damages consequent on an honest mistake or an error of judgment in making a diagnosis or in prescribing treatment, where there is reasonable doubt as to the nature of the physical condition involved or as to what should be done in accordance with recognized authority and good current practice."

[8]"You are instructed that under the law a misdiagnosis by a physician does not necessarily establish liability against him. A wrong diagnosis is not actionable unless (1) it was the result of negligence and (2) it was followed by improper treatment, proximately causing injury to the patient."

[9]"Negligence of a physician consists of his failure to exercise that reasonable and ordinary degree of learning, care and skill which is possessed and exercised by the average physician in the practice of his profession. It consists of doing some act which such a physician and surgeon would not do under the same or similar circumstances or in failing to do something which such a physician would have done under the same or similar circumstances.

"In the determination of whether or not a physician exercised reasonable care and skill as defined in these instructions in arriving at his decision to act or not to act must be determined on the basis of the facts and circumstances existing at the time of his decision."

2,[10] and 3,[11] contain the substance of the refused instructions, adequately and correctly state the law, and were sufficient to allow defendant to argue its specific theories to the jury. This is all that is required. *Kjellman v. Richards,* 82 Wn.2d 766, 514 P.2d 134 (1973); *Roberts v. Goerig,* 68 Wn.2d 442, 413 P.2d 626 (1966); *State v. Dana,* 73 Wn.2d 533, 439 P.2d 403 (1968).

 Thirdly, defendant contends the plaintiff failed to establish an appropriate standard of care required of a jail physician when he questioned medical experts as to what the average, competent doctor would have done under hypothetical conditions similar to the circumstances of this case. The standard of care in medical malpractice cases is that degree of care expected of the average, competent practitioner in the class to which he belongs, acting in the same or similar circumstances. *Pederson v. Dumouchel,* 72 Wn.2d 73, 431 P.2d 973, 31 A.L.R.3d 1100 (1967). Here, the jail physician, a general practitioner, is required to exercise the same standard of care of the average, competent doctor, and this is the class to which he belongs. We find no error.

 Finally, defendant claims that the size of the jury verdict evidences that substantial justice has not been done. For the reasons set forth above, we have found that

---

[10] "The plaintiff has the burden of proving each of the following propositions:

"(1) That the defendant acted or failed to act in one of the ways claimed by the plaintiff and that in so acting, or failing to act, was negligent; and

"(2) That the plaintiff was injured; and

"(3) That the negligence of the defendant was a proximate cause of the injury to the plaintiff.

"If you find from your consideration of all the evidence that each of these propositions has been proved, your verdict should be for the plaintiff. On the other hand, if any of these propositions has not been proved, your verdict should be for the defendant."

[11] "As may be observed from the Statement of the Issues which I have made to you, the claim of the plaintiff against the defendant is based on its alleged negligence.

"The mere fact, if it be a fact, that damages were sustained as alleged does *not of itself entitle the plaintiff to recover. Recovery* of damages can only be had by proof of negligence which was a proximate cause of the injury or damage claimed. In other words, negligence cannot be presumed from the mere fact that an injury occurred, or from the mere fact that damages were suffered, but it must be found as a fact from the evidence introduced."

no error occurred in the trial of this case. Proof of negligence, proximate cause and damages are questions of fact for the jury submitted on substantial evidence, and the jury's award will not be disturbed unless it unmistakably indicates passion or prejudice. *Curtiss v. YMCA,* 82 Wn.2d 455, 511 P.2d 991. (1973). Given the nature and extent of plaintiff's injuries, we cannot say as a matter of law that the verdict was a result of passion or prejudice.

Affirmed.

MUNSON, C.J., and McINTURFF, J., concur.

Petition for rehearing denied June 6, 1977.

Review granted by Supreme Court November 18, 1977.