179 N.J. Super. 433 (1981)
432 A.2d 538
ROLAND MAREK AND ANN MAREK, PLAINTIFFS-RESPONDENTS,
v.
PROFESSIONAL HEALTH SERVICES, INC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 28, 1981.
Decided June 4, 1981.
*434 Before Judges BOTTER, KING and McELROY.
Louis A. Ruprecht argued the cause for appellant.
*435 Marc J. Gordon argued the cause for respondents (Margolis, Gordon & Goldstein, attorneys; Lawrence P. Stern, on the brief).
The opinion of the court was delivered by KING, J.A.D.
The principal issue on appeal is whether the health care entity in this case could delegate to an independent medical contractor its duty of care in reading a patient's x-ray and thus escape liability for that contractor's negligence. We conclude that the duty to perform this patient service was nondelegable; the engagement of an independent contractor created no insulation against liability for that independent contractor's negligence.
Plaintiffs, Roland Marek and Ann Marek, brought this action against defendants, Nayan Kothari, M.D., Professional Health Services, Inc. (PHS), and Johns-Manville Products Corp. to recover damages for Roland's injuries resulting from an alleged error in diagnosis. Ann Marek's claim was per quod; all future references to plaintiff are to Roland only. A verdict against PHS only was returned in their favor for $200,000 for his injuries and for $50,000 on her per quod claim. The verdict was molded to reflect prejudgment interest and a 10% contributory factor. PHS' motion for new trial was denied and it appeals, contending (1) the trial judge erred in ruling as a matter of law that PHS was liable for the negligence of its independent contractor, radiologist Dr. Johnson, (2) the verdict was motivated by prejudice and was excessive and against the weight of the evidence, and (3) the jury instructions were plain error within R. 2:10-2.
Plaintiff had been an industrial employee of the Johns-Manville Company of North Brunswick for 27 years until he ceased working at age 47 in late 1975. During the 1970's Johns-Manville instituted an annual medical examination procedure for its employees. As part of this undertaking Johns-Manville arranged for PHS to take chest x-rays, audiograms and pulmonary *436 function tests of its employees. Kleinman, a PHS vice-president, described his company as a mobile health testing service operating throughout the United States, serving "thousands of industrial clients."
On October 23, 1974 plaintiff had a single, anterior-posterior chest x-ray taken at a mobile unit parked on company grounds. At trial, plaintiff alleged that this x-ray was negligently read as negative when it actually disclosed an early, treatable stage of lymphatic cancer. In December 1974 plaintiff had his annual company physical performed by Dr. Kothari, a local practicing internist engaged by Johns-Manville. Nothing abnormal was reported from either the 1974 x-ray or physical examination.
The testimony about the next annual examination, performed on October 21, 1975, varies but not in a manner material to the legal issue. On that date Dr. Kothari said that plaintiff had significantly enlarged glands in his neck, armpits and groin. Dr. Kothari was alarmed and plaintiff was advised by him to see his physician "at once." The employer, Johns-Manville, was also informed of plaintiff's condition on the same day. Plaintiff denied receiving this admonition from Dr. Kothari but he did see his private physician, internist Dr. Hart, on November 18, 1975. Plaintiff claimed this visit to Dr. Hart was prompted by a rumor that the plant was to be sold. Plaintiff said he did not know whether the prospective purchaser would provide the same medical coverage as Johns-Manville. Therefore he decided to get a complete physical before the anticipated transaction took place.
On Dr. Hart's advice a biopsy of cervical lymph nodes and bone marrow was performed at Columbia Presbyterian Hospital in New York early in December 1975. Thereafter plaintiff came under the care of Dr. Timothy Gee, Chief of the Leukemia Section of the Memorial Sloan Kettering Cancer Center in New York, on January 5, 1976. Dr. Gee diagnosed plaintiff's disease process as a Stage 4 diffuse, well-differentiated lymphocytic lymphoma. Stage 4 is the ultimate of four stages in the *437 classification of lymphoma. It is the most extensive, involving the spread of the disease beyond localized lymph nodes to the liver, kidneys, bone marrow, brain and other organs. Plaintiff was immediately placed on an intensive chemotherapy regimen. Since the disease showed no significant response and plaintiff experienced extensive side-effects, chemotherapy was discontinued in June 1976. Dr. Gee confirmed that plaintiff was occupationally disabled and in great discomfort from the time of the first visit in January 1976.
On November 4, 1976 plaintiff was placed on a 30-day treatment program with the experimental drug, interferon. He responded with a partial decrease in lymph node size. Plaintiff reacted to interferon treatment with high fever, appetite and hair loss, nausea and general weakness. Plaintiff's disability continued through the trial which was held in late February 1980.
At trial, plaintiff proceeded on the theory that PHS' subcontractor, Dr. Johnson, negligently misread the chest x-ray of October 23, 1974. Plaintiff's claims for damages consequent upon the alleged delayed diagnosis were limited to physical disability and pain and suffering during his lifetime, lost earnings during his lifetime, and the derivative claim of Mrs. Marek. Plaintiff specifically did not claim damages for foreshortened life expectancy, premature death or resultant loss of earnings.[1] Plaintiff claimed that a timely diagnosis from the October 1974 x-ray would have sparked prompt, conservative treatment with minimal side-effects resulting in a likely cure and little or no lost work.
Plaintiff's forensic expert, Dr. Goodman, a board-certified internist, first examined him in October 1976. On review of the *438 October 23, 1974 x-ray Dr. Goodman found enlargements on the hilar lymph nodes on one, and possibly both, sides of the chest. His diagnosis from the October 1974 x-ray was lymphocytic lymphoma, Stage 1, the most localized and treatable of the four classifications. Dr. Goodman described the disease process and diagnostic implications this way:
Q: [by plaintiff's attorney]: All right. I am sorry. As of the time that the chest x-ray was taken in October of 1974, on the 23rd, can you give us your opinion as to what the diagnosis at that time was?
A: [by Dr. Goodman]: At this time it was lymphocytic lymphoma, Stage 1.
Q: And what is "lymphocytic lymphoma, Stage 1"?
A: A lymphoma is a tumor of the lymph gland in which the main cells are a certain type of blood cell. In this case lymphocytes  and these are blood vessels which, of course, are normally found in the blood in a relatively small percent; but when they become tumorous, they grow excessively; and in this case they were growing in this man's or this patient's lymph node, the one on the right.
Now, the staging in this condition is extremely important medically because there are four stages. Stage 1 means that there's only one lymph gland involved; and the reason it is important is because if the patient is treated at Stage 1, the chance of successful therapy and almost sometimes complete cure or certainly a prolonged period of life is very, very good; whereas if it is not diagnosed until he gets Stage 4, it completely changes the outlook; and that's why we as doctors put such emphasis on stages of these patients.
Q: Can you tell us with any more precision than you just have as to the difference between Stage 1 and Stage 4 in terms of life expectancy?
A: Yes. If this type of condition is diagnosed while it's still Stage 1, that's a single lymph node involvement and treated promptly and appropriately, the life expectancy of these patients then improves so that 50 to 70 percent of such patients have a good chance of living for 5 years or more; and that "more" can be almost indefinite. The word "more" there is indefinite.
I mean, some people go on. I know. I have one patient that's going 30 years, but that would be unusual.
In other words, it's far, far greater than the five  the five years is not a cutoff. It's just a starting point.
Q: What about Stage 4?
A: Stage 4 is the reverse. In Stage 4 almost all of these patients are gone by the end of 3 or 4 years. Anyone who goes beyond that would a fortunate survivor.
Dr. Goodman testified that the treatment of choice, if the disease had been picked up on the October 1974 x-ray at Stage 1, would have been by radiation "in an effort to kill the tumorous tissue and shrink the lymph node down to a normal size." He stated:

*439 Had the patient been diagnosed in Stage 1, although the concepts change from day to day in this field, it's most likely that he would have just gotten the x-ray therapy with a minimum amount of side effects and less stress and strain on the body. But being in Stage 4, the doctors in New York felt he had to have the chemotherapy, which is a much more rigorous type of therapy.
In Dr. Goodman's opinion the failure to read the chest x-ray of October 1974 "as showing the enlarged lymph node and the suspicious area on the other side" was a "deviation from standard medical practice." He considered the x-ray "quite obvious" for lymphatic pathology, saying:
I don't think that it's medically within the standards of medical practice to completely ignore the finding that we have seen on the x-ray, which is an enlarged lymph node; and in this case, of course, this could have a deleterious effect on this patient. He wasn't diagnosed until it went from Stage 1 to Stage 4.
As I indicated earlier, this had a substantial and still has a substantial effect on his prognosis, life expectancy, and also on the type of treatment which was given to him.
In defense, PHS presented two witnesses, Vice-President Kleinman, and Dr. Johnson, the radiologist who read the October 1974 chest x-ray. Kleinman said that after PHS developed the 100 or so x-rays taken at the mobile unit at Johns-Manville in October 1974, they were delivered to Dr. Johnson at his Philadelphia office. Dr. Johnson was to read the x-rays and report positive findings only to PHS, which would relay them to the patient's employer. The doctor was an independent contractor; he had no written agreement with PHS and was compensated without any payroll deductions.
Dr. Johnson testified to his credentials as a board-certified radiologist and Assistant Clinical Professor of Radiology at the Temple University Hospital and Medical School. When reading films associated with employer's physical examinations for PHS he was aware of the identity of the patient's employer only; he had no other clinical data. He took "about two hours or three hours to read 100 films" and would be paid for "each film, $1." He read the questioned 1974 x-ray as normal. At oral argument, counsel for plaintiff advised us that a separate suit against Dr. Johnson in New Jersey has been dismissed upon an *440 unappealed finding of this forum's lack of in personam jurisdiction over him.[2] Thereafter an action was brought and is pending against the doctor in the Court of Common Pleas in the Commonwealth of Pennsylvania.
Appellant PHS claims that the trial court erred in instructing the jury that it was vicariously liable as a matter of law for any negligence of its independent contractor, Dr. Johnson. PHS relies on a line of New Jersey cases commencing with Cuff v. Newark and New York R. Co., 35 N.J.L. 17 (Sup.Ct. 1870), aff'd o.b. 35 N.J.L. 574 (E. & A. 1871), through Terranella V. Union Bldg. & Constr. Co., 3 N.J. 443 (1950), to Majestic Realty Associates Inc. v. Toti Contracting Co., 30 N.J. 425 (1959), which expresses the general rule of no liability where a task is delegated to a subcontractor but recognizes certain exceptions dependent on public policy considerations. These exceptions include (a) retention of control over the manner and means of doing the work, (b) engagement of an incompetent subcontractor and (c) where the activity constitutes a nuisance per se or is inherently dangerous. Id. at 430-431. Dean Prosser has said that American courts "have continued to repeat the `general rule' of non-liability with exceptions, whose very number is sufficient to cast doubt upon the validity of the rule." Prosser, Torts (4 ed. 1971) § 71 at 468. He observes that the Restatement, Torts, "has devoted no less than twenty-four sections" to the topic, embodying the general principle and some 23 separate exceptions. Id. at 469. Another noted authority contends that the defense meets "mounting disfavor ... [and] has become suspect and.... there are those who would do away with it entirely." Harper and James, The Law of Torts, § 26.11 at 1403 (1956). The Reporter's notes for the Restatement observe that the exceptions "are so numerous, and they have so far eroded the `general rule' that it can now be said to be `general' only in the *441 sense that it is applied where no good reason is found for departing from it." Restatement, Torts 2d § 409, comment b, at 370 (1965). The character of the exceptions seem to have been shaped at least in part by the importance of the undertaking. Dean Prosser observes that "it is difficult to suggest any criterion by which the non-delegable character of such duties may be determined, other than the conclusion of the courts that the responsibility is so important to the community that the employer should not be permitted to transfer it to another." Prosser, supra, § 71 at 471. Another authority finds the policy source of the exception in "situations wherein the law views a person's duty as so important and so preemptory that it will be treated as nondelegable." Harper and James, supra, § 26.11 at 1406.
In the situation before us we conceive the duty assumed by PHS to plaintiff, i.e., to carefully and diligently diagnose within reasonable professional standards any condition or disease positively appearing on his chest x-ray, was a nondelegable duty. The breach was of the primary undertaking by PHS to plaintiff, not of any aspect ancillary or incidental to the implied contract to provide a reasonable diagnosis. The very work that was contracted for was negligently performed, Schutte v. United Electric Co., 68 N.J.L. 435 (Sup.Ct. 1902), not some collateral task. Rosenquist v. Brookdale Homes, Inc., 133 N.J.L. 305, 307 (E. & A. 1945); see 2 Restatement, Torts 2d, § 426 at 413. This conclusion is reinforced in the context of this case because neither plaintiff nor his employer, Johns-Manville, knew of or had any choice in selecting the subcontractor, Dr. Johnson. Moreover, plaintiff should not be required to pursue his remedy against a possibly under-insured or judgment-proof subcontractor, previously unknown to him and not amenable to suit in this forum, in some foreign jurisdiction.
We also find that this case falls within another of the myriad conventional exceptions recognized by the Restatement, Torts 2d, § 249 at 421, which states:

*442 One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.
This section was previously recognized as an exception to the general no-duty rule by this court in Hill v. Newman, 126 N.J. Super. 557, 562 (App.Div. 1973), certif. den. 64 N.J. 508 (1974). There the plaintiff purchased furniture from Grant's which she found defective on delivery. She reported it to Grant's and was assured that someone would be sent to fix it. Thereafter she received a call from a man, Newman, who said he was from Grant's and an appointment was made to do the repairs. When Newman arrived at her home he identified himself as the man from Grant's who had come to fix the furniture. She admitted him, he fixed the furniture, and, as a result, an explosion occurred because of the lacquer he used, injuring the plaintiff. This court held that Grant's was vicariously liable under § 429 for Newman's negligence notwithstanding his independent contractor status. See, also, Arthur v. St. Peter's Hospital, 169 N.J. Super. 575, 581 (Law Div. 1979).
In analogous situations other courts have found the duty to provide competent and adequate medical care nondelegable. In Shea v. City of Spokane, 17 Wash. App. 236, 562 P.2d 264 (Ct.App. 1977), the court rejected the city's contention that it was not vicariously liable for an independent contractor jail physician's negligent treatment of an inmate. The court relied by analogy upon "the rationale of cases involving the liability of employers who provide medical care and treatment to their employees." Id. at 268. See DeZon v. American President Lines, 318 U.S. 660, 667-668, 63 S.Ct. 814, 818-819, 87 L.Ed. 1065 (1943) (Jones Act renders shipowner liable for malpractice of ship's doctor in treating injured seaman); Isgett v. Seaboard Coast Line R. Co., 332 F. Supp. 1127, 1141 (D.S.C. 1971) (nondelegable duty of railroad's examining physician certifying injured *443 railroad worker back to job). We hold that the trial judge correctly instructed the jury that PHS was vicariously liable for any malpractice of its independent contractor radiologist, Dr. Johnson.[3]
In view of Dr. Goodman's previously recited testimony on medical causation, the likely success of treatment, the character of treatment between Stage 1 and Stage 4 lymphomas, and a victim's potential longevity, we cannot say that the monetary verdicts in favor of plaintiffs totalling $200,000 were excessive or the result of prejudice. Plaintiff Roland Marek was compelled to retire at age 47 because of his disease process. The jury was entitled to believe Dr. Goodman's testimony on his prospects if the disease had been diagnosed and treated radiologically at Stage 1 in late 1974. If there is a reasonable basis in the evidence to sustain a damage award, we may not disturb it. The size of the verdict is neither "shocking" nor "manifestly unjust" and must be affirmed. Baxter v. Fairmont Food Co., 74 N.J. 588, 596 (1977). To an extent the trial was emotional because of plaintiff's physical condition. The trial judge carefully and repeatedly instructed the jury not to be swayed by sympathy. We cannot say that the verdict was tainted by sympathy or passion on the record before us. On defendant PHS' final point, there was no objection to the jury charge on damages, R. 1:7-2. We have reviewed the charge and find it balanced and fair. We reject defendant's contention of "plain error" therein. R. 2:10-2.
Affirmed.
NOTES
[1] See Alfone v. Sarno, 168 N.J. Super. 315 (App.Div.), certif. granted 81 N.J. 332 (1979), holding that the beneficiaries under the Wrongful Death Act have a separate cause of action for damages even though decedent recovered damages for personal injuries during her lifetime but barring any double recovery of damages.
[2] See World Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).
[3] By today's holding we do not intend to suggest that a physician who engages a specialty consultant, such as a radiologist, pathologist or anesthesiologist or any other, is vicariously liable for the specialist's dereliction. Tramutola v. Bortone, 63 N.J. 9, 16 (1973). For a good discussion of the entire area of vicarious liability in malpractice, see 1 Louisel and Williams, Medical Malpractice, § 16.01 to § 16.08 at 485 to 509 (1977).