IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| AHMET HOPOVAC, | ) | No. 33992-1-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | PUBLISHED OPINION |
| DEPARTMENT OF CORRECTIONS, | ) | |
| and KIMBERLEY ALLEN, | ) | |
| | ) | |
| Respondents. | ) | |

LAWRENCE-BERREY, J. — We answer the question of whether the Department of

Corrections (Department) owes a duty of care to protect felons under its supervision from

the intentional torts of third parties. For such a duty to exist, *Restatement (Second) of*

*Torts* § 314A(4) (Am. Law Inst. 1965) would require felons to be in the custody of the

Department under circumstances such as to deprive them of their normal opportunities for

protection. We determine that standard community custody conditions, such as those

here, do not deprive felons of their normal opportunities for protection. We, therefore,

answer the question in the negative and affirm the summary dismissal of Mr. Hopovac's

claim.

FACTS

Because the trial court dismissed this case on summary judgment, the facts and all reasonable inferences are presented in the light most favorable to Mr. Hopovac, the nonmoving party. *Winston v. Dep't of Corr.*, 130 Wn. App. 61, 63, 121 P.3d 1201 (2005).

In January 2011, Mr. Hopovac was released from the Grant County jail after completing a sentence for residential burglary, theft, and forgery. He reported to Community Corrections Officer Patrick Markovics to begin his community supervision. Mr. Hopovac's conditions of community supervision prohibited him from, among other things, leaving Grant County and possessing a firearm.[1]

When Mr. Hopovac first reported for community supervision, he asked Mr. Markovics to transfer his supervision to Idaho so he could live with his family. Mr. Hopovac requested the transfer because he did not have any money or a place to stay in Grant County. At that time, he did not fear for his safety. Mr. Markovics told Mr. Hopovac they would discuss it more the following day.

---

[1] Mr. Hopovac was also required to notify the Department before moving or changing jobs, report to and abide by written and oral instructions from Mr. Markovics, work at a Department-approved service, not possess or consume controlled substances or alcohol, not enter any establishments that sell alcohol, pay supervision fees, and perform other affirmative acts necessary to monitor compliance.

2

The following day, Mr. Hopovac did not report for his supervision appointment. The Department issued a warrant for his arrest. Mr. Hopovac was arrested almost two months later. The next time he reported for supervision, he told Mr. Markovics he had used methadone, methamphetamine, and marijuana. He entered into a stipulated agreement regarding his drug use.

Mr. Markovics submitted a request to transfer Mr. Hopovac's supervision to Idaho. In the transfer request, Mr. Markovics explained that Mr. Hopovac was homeless in Washington, Mr. Hopovac's father in Idaho was willing to help him, and Mr. Hopovac believed he had a job lined up in Idaho. Idaho denied the transfer request partly because it did not include a presentence investigation or police report. Idaho stated it could not investigate the request without one of these documents. Idaho also denied the request partly because Mr. Hopovac had violated the terms of his supervision within the last 30 days by using drugs and failing to report. After receiving Idaho's response, Mr. Markovics resubmitted the transfer request with a police report.

In mid-April, an incident occurred that made Mr. Hopovac begin to fear for his safety. Mr. Hopovac and his friend Christopher Jones were at Mr. Jones's house. While they were there, a Pocos Locos gang member arrived at the house. The gang member told them he had just shot someone and then showed them the handgun he used. The gang

3

member said he did not want the police to catch him with the handgun, so he asked Mr. Jones to hide it for him. Mr. Jones hid the handgun, and the gang member left. The gang member returned several hours later, retrieved the handgun, and gave Mr. Jones methamphetamine in exchange for hiding it.

Mr. Jones later went to the police and reported what he knew about the shooting. The case attracted media attention, including coverage on the radio and a story in the local newspaper. As a result, gang members began threatening Mr. Jones and his family. Because Mr. Hopovac was present at the house when the gang member came over, the gang suspected that Mr. Hopovac also played a role in reporting information to the police. The gang members never directly threatened Mr. Hopovac, but began following him. Mr. Hopovac believed he was in danger. Mr. Hopovac had an upcoming check-in at the Department supervision office and decided he would ask the Department for help during this visit.

When Mr. Hopovac arrived for his scheduled check-in, Mr. Markovics was out of the office, so Community Corrections Supervisor Kimberly Allen met with him. Mr. Hopovac told Ms. Allen he was in danger because of what he witnessed at Mr. Jones's house and told her he needed to get out of Washington. Ms. Allen told Mr. Hopovac that she needed a police report in order to request an expedited transfer request to Idaho and

instructed Mr. Hopovac to go to the police. Mr. Hopovac told Ms. Allen he could not go to the police because gang members were following him. Ms. Allen told Mr. Hopovac there was nothing she could do for him. She asked Mr. Hopovac if he had any family or resources in the area, and Mr. Hopovac said he did not.

Several days later, Mr. Hopovac failed to report for supervision, and the Department issued a warrant for his arrest. The Department then withdrew its resubmitted request to transfer Mr. Hopovac's supervision to Idaho.

On May 24, Mr. Hopovac began walking to a gas station to get a pack of cigarettes. As he was walking, a car pulled up near him. Two men jumped out of the backseat and told him to get in the car. Mr. Hopovac complied and the men drove him to a house. The men took him inside. Once inside, a larger group of men began beating Mr. Hopovac. They asked Mr. Hopovac who reported the shooting to the police and asked if Mr. Hopovac was involved in reporting the shooting to the police. They then pulled off two of Mr. Hopovac's toenails with a pair of pliers. A man then told Mr. Hopovac to hold out his hand. Mr. Hopovac did so, and the man brought an axe down on Mr. Hopovac's hand, partially severing several fingers.

Mr. Hopovac later went to the hospital where doctors reattached his fingers.

Several days later, Mr. Hopovac was arrested on the outstanding Department warrant. He

never recovered full function of his hand or arm.

Mr. Hopovac sued the Department and Ms. Allen for "tortious conduct." Clerk's

Papers at 10. The Department moved for summary judgment, arguing it did not owe Mr.

Hopovac a legal duty to protect him from assault while he was under community

supervision. The trial court agreed and granted summary judgment for the Department.

Mr. Hopovac appeals.

## ANALYSIS

Mr. Hopovac argues the Department owed a duty of care to protect him from

assault by the gang members. He contends the Department owed him a duty because the

terms of his supervision—specifically, the conditions prohibiting him from leaving Grant

County and possessing a firearm—limited his ability to protect himself.

An essential element in any negligence claim is the existence of a legal duty that

the defendant owes the plaintiff. *Kaltreider v. Lake Chelan Cmty. Hosp.*, 153 Wn. App.

762, 765, 224 P.3d 808 (2009). Whether a duty exists is a legal question this court

decides de novo.[2] *N.K. v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 175 Wn. App. 517, 525, 307 P.3d 730 (2013).

In general, there is no affirmative duty to protect others from the criminal acts of third parties. *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 199, 943 P.2d 286 (1997). The fact that a person knows that another person needs aid or protection does not in itself impose a duty to act. *Restatement* § 314. However, an exception exists where the defendant is in a special relationship with either the third party or the foreseeable victim of the third party's conduct. *N.L. v. Bethel Sch. Dist.*, 186 Wn.2d 422, 430, 378 P.3d 162 (2016).

Several examples of special relationships establishing an affirmative duty to protect another person from the torts of third parties are set forth in *Restatement* § 314A. This court has adopted subsection (4), which provides:

> One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a . . . duty [to take reasonable action to protect the other person from unreasonable risk of physical harm].

*Restatement* § 314A(4); *accord Shea v. City of Spokane*, 17 Wn. App. 236, 242, 562 P.2d 264 (1977) (adopting *Restatement* § 314A(4)), *aff'd*, 90 Wn.2d 43, 578 P.2d 42 (1978).

---

[2] Mr. Hopovac argues that select portions of the trial court's oral ruling were incorrect. Because this court's review is de novo, this court need not individually analyze

This duty to protect extends to risks arising from the intentional or criminal acts of third parties. *Restatement* § 314A(4) cmt. d.

It is undisputed the Department owes a duty to ensure the health, welfare, and safety of incarcerated individuals. *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 635, 244 P.3d 924 (2010); *Kusah v. McCorkle*, 100 Wash. 318, 325, 170 P. 1023 (1918). For example, in *Shea*, Michael Shea was in jail and became nauseous. *Shea*, 17 Wn. App. at 238. He asked a guard for a tranquilizer or a doctor. *Id.* The guard denied both requests. *Id.* Mr. Shea collapsed and suffered a spinal injury. *Id.* at 240. He then sued the jail for negligence. *Id.*

The *Shea* court adopted *Restatement* § 314A(4) and held that the jail had a nondelegable duty to provide competent medical care to Mr. Shea. *Shea*, 17 Wn. App. at 242. The court reasoned that the duty to prisoners arises because when individuals are arrested and imprisoned for the protection of the public, they are deprived of their liberty as well as their ability to care for themselves. *Id.* at 241-42. Thus, the corresponding duty "is a positive duty arising out of the special relationship that results when a custodian has complete control over a prisoner deprived of liberty." *Id.* at 242. In reasoning that the jail's duty arose from having complete control over Mr. Shea, the court noted that

---

the portions of the trial court's oral ruling that Mr. Hopovac contests.

8

"[t]he extent of this control is well illustrated in this case by the jailer's denial of plaintiff's request to telephone a doctor." *Id.*

The central question in this case is whether *Restatement* § 314A(4) imposes a duty on the Department to protect felons under its supervision. There does not appear to be any authority addressing this question.

Mr. Hopovac and the Department each argue that the plain language of *Restatement* § 314A(4) supports their respective positions. The first portion of *Restatement* § 314A(4) provides that only one who "voluntarily takes *the custody* of another" owes a duty to protect that person from third parties. (Emphasis added.) The Department argues this language limits *Restatement* § 314A(4)'s application to physical custody only. But this is a very narrow interpretation of the word "custody." "Custodians include those who actually exercise control over their charges or who have legal authority to control them." DAN B. DOBBS, THE LAW OF TORTS § 326, at 884 (2000); *see also Jacobs v. Ramirez*, 400 F.3d 105, 105-06 (2d Cir. 2005) (parolees are still in "custody" for purposes of 42 U.S.C. § 1983 analysis). While the Department did not physically control Mr. Hopovac, his conditions of community supervision demonstrate the Department had legal authority to control him.

9

But this conclusion is not dispositive of the central question presented. The latter portion of *Restatement* § 314A(4) imposes liability only where the conditions of custody "deprive [the plaintiff] of his normal opportunities for protection." Mr. Hopovac argues he was restricted from possessing a firearm as a condition of his community supervision. But Mr. Hopovac, similar to nearly all persons supervised by the Department, was a convicted felon. All felons are prohibited from possessing firearms by virtue of their felony convictions. *See* RCW 9.41.040(1)-(2). Because his right to possess a firearm was lost by virtue of his felony conviction, this condition of community custody did not deprive Mr. Hopovac of any right.

The only community custody condition that affected Mr. Hopovac's ability to protect himself was the condition that he remain in Grant County. Although this condition affected Mr. Hopovac's ability to protect himself, that is not the standard for imposing liability. Rather, Mr. Hopovac must establish the condition "deprive[d] [him] of his *normal opportunities* for protection." *Restatement* § 314A(4) (emphasis added). It is in this respect where we diverge from our dissenting colleague.

The test is not whether a trier of fact could find that Mr. Hopovac was deprived of *one* normal opportunity for protection. If that was the test, every condition that somehow impacted self-protection would create an issue of fact. The test is whether a trier of fact

10

could find that Mr. Hopovac was deprived of his *normal opportunities* for protection. We thus must view what panoply of opportunities Mr. Hopovac still had for protection. Among other opportunities to protect himself, Mr. Hopovac still could carry a weapon (other than a gun), he still could move anywhere within Grant County, and he still could report the threats to law enforcement and law enforcement could take appropriate actions. We conclude that no reasonable trier of fact could find that the opportunities Mr. Hopovac had for protection constituted a *deprivation* of that right. Moreover, to hold otherwise would put the Department in an untenable position every time a felon under community custody claimed his or her safety was at risk and asked to move outside of the supervising county.

For these reasons, we conclude that Mr. Hopovac did not have a special relationship with the Department under *Restatement* § 314A(4), and the Department did not owe him, or any felon subject to standard community custody conditions, a duty of care.[3] The trial court did not err when it summarily dismissed Mr. Hopovac's tort claim.

---

[3] The Department also argues it owed no duty to Mr. Hopovac because he absconded from supervision. *See Husted v. State*, 187 Wn. App. 579, 586, 590, 348 P.3d 776, *review denied*, 184 Wn.2d 1011, 360 P.3d 817 (2015) (holding the Department has no duty to control an offender who absconds from supervision because it no longer "take[s] charge" of the offender under *Restatement* § 319). Because our above analysis is dispositive, we decline to address this argument. *State v. McCord*, 125 Wn. App. 888, 895, 106 P.3d 832 (2005).

No. 33992-1-III
*Hopovac v. Dep't of Corr.*

Affirmed.

Lawrence-Berrey, J.

I CONCUR:

Korsmo, J.

12

No. 33992-1-III

FEARING, C.J. (concurring in part and dissenting in part) — The majority justifies its ruling on four propositions. First, Washington earlier adopted *Restatement (Second) of Torts* § 314A (Am. Law Inst. 1965). Second, the Department of Corrections' duty to protect others from criminal acts of third parties extends to felons in community custody, not only those in prison. Third, the Department of Corrections, as a matter of law, is not liable for denying Ahmet Hopovac the opportunity to use a gun to protect himself since Hopovac's status as a felon already precluded his possession of a gun. Fourth, the Department of Corrections, as a matter of law, is not liable for precluding Hopovac's flight from Grant County because the opportunity to flee town, the county, or the state does not qualify as "normal opportunities for protection."

I agree with the majority's first three rulings. I disagree with the fourth ruling. Admittedly an exhaustive search finds no decision wherein a court held that a question of fact existed as to the liability of a government entity because parole conditions precluded travel outside a county or that the ability to travel beyond one's county constitutes a "normal opportunity for protection." Nevertheless, the majority cites no authority to support its position to the contrary. The majority also fails to analyze what constitutes a

normal opportunity for protection and omits any explanation for stating that disappearing from one's community does not constitute a normal opportunity for protection.

Subsection 4 of *Restatement (Second) of Torts* § 314A provides:

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his *normal opportunities for protection* is under a similar duty to the other.

(Emphasis added.) The words "normal" and "opportunity" are key to our analysis. The terms may need no defining, but the Cambridge English Dictionary defines "normal" as

ordinary or usual; as would be expected.

CAMBRIDGE ENGLISH DICTIONARY ONLINE,

http://dictionary.cambridge.org/us/dictionary/english/normal (last visited Feb. 1, 2017). The same dictionary defines "opportunity" as

an occasion or situation which makes it possible to do something that you want to do or have to do, or the possibility of doing something.

CAMBRIDGE ENGLISH DICTIONARY ONLINE,

http://dictionary.cambridge.org/us/dictionary/english/opportunity (last visited Feb. 1, 2017). Under the *Restatement*, fleeing one's town to avoid violence need not be an ordinary step actually taken by those in danger. Running need not be a typical measure exercised. Instead, skedaddling need only be an ordinary possibility.

Because of a sheltered, privileged life and because of a large, formerly athletic frame, I have never needed or sought protection from a mob, a gang, an angry spouse, or anyone wishing to physically harm me. Nevertheless, from my decades of reading newspapers, I know that Mafia snitches must often escape their respective communities

2

and assume another identity. From my experience as a lawyer, I comprehend that wives of abusive husbands must flee or would benefit by fleeing to another county or state. Thus, a parole condition eliminating one's liberty to escape to another county or beyond may interfere with a normal opportunity for protection. At least, a trier of fact should determine whether flight constitutes an ordinary possibility for protection.

The criminal justice system depends extensively on the cooperation of informants. Although Ahmet Hopovac may not have been an informant, a criminal gang considered him an informant. Public policy should encourage state protection of informants or purported informants facing the wrath of a mob, about whom the informant tattled.

The majority additionally concludes that Ahmet Hopovac fails to present a question of fact as to the application of *Restatement (Second) of Torts* § 314A because the *Restatement* section refers to "normal opportunities for protection." The majority emphasizes the plural nature of the word "opportunities." From this emphasis, the majority concludes that any plaintiff relying on the *Restatement* language must present evidence that his custodian thwarted more than one opportunity for protection. Ahmet Hopovac only posited one legitimate opportunity.

The majority fails to recognize the universal view that use of the singular includes the plural, and the plural the singular. RCW 70.74.010; *Yousoufian v. Office of King County Exec.*, 152 Wn.2d 421, 434, 98 P.3d 463 (2004); *State v. Nugent*, 20 Wash. 522, 523, 56 P. 25 (1899); *State v. Veazie*, 123 Wn. App. 392, 396, 98 P.3d 100 (2004); *State v. Wiggins*, 114 Wn. App. 478, 483, 57 P.3d 1199 (2002); *Hinton v. Johnson*, 87 Wn.

3

App. 670, 675, 942 P.2d 1061 (1997); *State v. Welty*, 44 Wn. App. 281, 283, 726 P.2d

472 (1986). Since courts apply the *Restatement* verbatim, *Restatement* sections function

as statutes. RCW 1.12.050, concerning construction of statutes, declares:

> Words importing the singular number may also be applied to the plural of persons and things; words importing the plural may be applied to the singular . . . .

The majority's reading the plural to exclude the singular would lead to silly

consequences. A motel might post a placard that declares: "Please no pets." John

Steinbeck could sleep with Charley as long as he traveled with only Charley. Steinbeck

would have brought only one pet, not pets. A tavern may post a sign that reads: "No

minors allowed." According to the majority, Holden Caulfield could enter the tavern if

he is the only underage patron.

To illustrate further the error of the majority, assume that the *Restatement* reads as

follows:

> (4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of *a normal opportunity for protection* is under a similar duty to the other.

Under the majority's reading of the rule, if the custodian deprived the one in custody of

two opportunities to protect himself, the custodian would avoid liability because the rule

only mentions the singular. If the majority holds that plural cannot mean singular, the

logical extension of the holding is that singular cannot mean plural. So the custodian

would avoid liability the more the custodian deprives the ward of means of protection.

4

No. 33992-1-III
*Hopovac v. Dep't of Corr.* (concurring in part and dissenting in part)

I would deny the State's summary judgment motion to the extent the State argues it had no obligation to protect Ahmet Hopovac because of the community custody condition prohibiting travel outside Grant County. I would address, with the majority, the State's alternative argument that Ahmet Hopovac, as a matter of law, forewent Department of Corrections' liability under *Restatement (Second) of Torts* § 314A because of his behavior in violating community custody conditions, particularly his socializing with others engaged in criminal activity and his failing to contact the police. Otherwise, I would leave to a jury the questions of whether the Department of Corrections breached a duty and whether the breach caused Hopovac injury.

I concur in part and dissent in part.

_Fearing, J._
Fearing, C.J.

5