OTIS RIVERS, Claimant, v STATE OF NEW YORK, Defendant. (Claim No. 72350.)

Court of Claims, January 25, 1989

## APPEARANCES OF COUNSEL

*Kliegerman & Friess (Rosemary Carroll* of counsel), for claimant. *Robert Abrams, Attorney-General (Frederick H. Mc-Gown, III,* of counsel), for defendant.

## OPINION OF THE COURT

EDWIN MARGOLIS, J.

This is an action for medical malpractice arising from an operation performed by a private physician in an outside hospital on an inmate in the custody of the Department of Correctional Services (DOCS). In 1985, claimant was a prisoner at Greene Correctional Facility when, at the correctional

facility's infirmary, he was examined by Dr. Joshua T. Rosenfield, an employee of DOCS. Dr. Rosenfield made a diagnosis of a left inguinal hernia, recommended surgery and noted this information on the patient's medical records. In an examination before trial (EBT) in a related Supreme Court action, Dr. Rosenfield stated that since there was no surgeon or operating room attached to the correctional facility's infirmary, it was the usual custom and practice to send inmates to civilian hospitals for surgery to be performed on an in-patient or out-patient basis, depending upon the nature of the surgery required. Dr. Rosenfield further testified that, although he did not specifically note the name of the surgeon to perform the outside surgery on the patient's records at the time of his diagnosis, he knew that usually Dr. Joseph R. Cally performed general surgery when inmates were referred to local outside facilities.

According to the transcript of Dr. Cally's EBT in the Supreme Court proceeding, a member of the medical records staff of the infirmary telephoned Pamela Merante, Dr. Cally's secretary, and made arrangements for the surgery on claimant. Ms. Merante prepared the preadmission form for claimant's surgery at the Memorial Hospital of Greene County in Catskill, New York, from the information she obtained over the phone. It appears that a drastic mistake occurred at this point. Although Dr. Rosenfield's diagnosis and the entries on claimant's medical records at the correctional facility indicated a *left* inguinal hernia, Ms. Merante filled out the preadmission form to indicate that the diagnosis was *right* inguinal hernia. No evidence was introduced as to how this error occurred.

Sometime on June 4, 1985, claimant was directed to report to the correctional facility infirmary. There, he was prepped for the operation which was to be performed the following morning and, as part of the preparation procedure, he was asked to sign a form on which he consented to a "left inguinal herniorrhaphy". The next morning, June 5, 1985, claimant was transported by two correction officers from the facility to Memorial Hospital, where he was given another consent form by hospital personnel. He remonstrated that the form handed to him was blank, but was told simply to sign it and that it would be filled in later. He did so. This second consent form was apparently filled in from the hospital admissions records and, when completed, gave permission to "repair right inguinal hernia".

Dr. Cally, who is now deceased, testified at his EBT that he

never physically examined the patient before he was anesthetized and taken into the operating room. The doctor stated that after the patient was unconscious and on the operating table with his abdomen uncovered, but before the first incision was made, he "saw a large left hernia bulge, which was obviously visible to the naked eye. It was unequivocal. At this point, Mr. Rivers was asleep and I couldn't investigate further and that forced me to proceed with the right and to ignore the fact that the left was there." Dr. Cally testified that he proceeded to perform the right inguinal repair because "the only records available to me—he had signed the consent for the right inguinal hernia and the admission record stated right inguinal hernia."

The correctional facility infirmary physician, Dr. Rosenfield, and the operating surgeon, Dr. Cally, did not consult about claimant's condition at any time. Nor were the medical records of the correctional facility with respect to claimant ever sent to Dr. Cally for review. Dr. Cally relied only on the diagnosis as conveyed to his secretary by the medical records staff of the correctional facility (or as the telephone call transmitting the diagnosis was perceived by her) and on the consent form signed by claimant after he arrived at the outside hospital.

The Hearing Committee of the New York State Board for Professional Medical Conduct, after a full evidentiary hearing, found that claimant had a left inguinal hernia and specifically rejected Dr. Cally's contention that claimant also had a right inguinal hernia. The Hearing Committee further found that Dr. Cally did not properly examine claimant, that he did not obtain an adequate medical history, and that he did not properly evaluate claimant's medical condition prior to performing surgery. The Hearing Committee concluded that Dr. Cally failed to perform a left inguinal repair and subjected claimant to unnecessary surgery in the right inguinal area. The Commissioner of Health of the State of New York affirmed this finding. Subsequently, the Board of Regents Review Committee recommended that Dr. Cally's license to practice medicine in the State of New York be revoked for his actions in this and other cases and the Board of Regents, the State licensing authority, did revoke his license.

ISSUES PRESENTED

(1) Did the State commit any act or omission which constitutes negligence with respect to claimant?

(2) Did Dr. Cally commit any act or omission which constitutes negligence with respect to claimant?

(3) If Dr. Cally is found to be negligent, is the State vicariously liable for such negligence?

DISCUSSION

(1)

Claimant contended that the State was guilty of negligence in that it did not furnish claimant's medical records to Dr. Cally prior to the operation, in violation of the appropriate standard of medical care. In support of this argument, claimant introduced the Manual of Standards for Adult Correctional Institutions promulgated by the American Correctional Association (ACA). The medical component of these standards requires a correctional facility, when sending a patient to an outside hospital, to also forward the patient's medical records. However, this same manual recites that as of August 8, 1981, only 32 out of 600 correctional facilities in the United States had been accredited as adopting and complying with these standards. Claimant has therefore failed to prove this was the prevailing medical standard in the community which encompassed Greene Correctional Facility, no matter how one defines community or how large a geographical area is included, at the time of claimant's surgery.

Claimant also introduced testimony that, subsequent to the operation, Greene Correctional Facility changed its procedures and now requires the outside surgeon to come to the facility to examine the patient prior to an operation and also requires the inmate's appropriate medical records to be forwarded to the surgeon. However, this is of no avail to claimant since this procedure was not in effect in June of 1985 and, therefore, the facility could not be guilty of violating its present standard at that time. Neither was the State negligent in failing to adopt such a standard prior to June 1985. With only 32 out of 600 institutions adopting the ACA standards by 1981, it is clear that they were normative goals to be striven for, not the prevailing medical standards of any given community. Claimant introduced absolutely no expert medical testimony with respect to any standard actually existing at the time of claimant's operation, either within the geographic community or the community of prisons for adults. Thus, the court finds that claimant has failed to sustain his burden of proving the direct negligence of defendant.

### (2)

Although there was no testimony by a medical expert as to the applicable standards of medical care in the community to establish that Dr. Cally's conduct violated such standards, exhibits 15, 25, 26 and 50 clearly prove Dr. Cally's negligence and malpractice with regard to the operation on claimant. This finding was made by the Hearing Committee of the State Board for Professional Medical Conduct of the Department of Health and ratified by both the Commissioner of Health and the Board of Regents. (See above.) These exhibits were introduced into evidence by claimant without objection by the State. Thus, there is sufficient evidence in the record to find that Dr. Cally's treatment of the claimant constituted negligence.[1]

Furthermore, even though in medical malpractice actions a departure from the accepted standards of medical practice must ordinarily be proven by expert medical opinion testimony, under certain circumstances a departure from the standard may be established without the aid of an expert. *(Fiore v Galang,* 64 NY2d 999, 1001; *Meiselman v Crown Hgts. Hosp.,* 285 NY 389, 396.) A medical expert's testimony is not required where a lay person, relying on common knowledge and experience, can find that the harm would not have occurred in the absence of negligence. *(Griffin v Norman,* 192 NYS 322 [App Term, 1st Dept] [extraction of wrong tooth].) This exception applies to the instant action. A lay person may find that under the facts of this case, where the patient is referred for surgical repair of a left inguinal hernia, and the operating surgeon nevertheless performs a right inguinal herniorrhaphy, such act constitutes negligence. The court so finds.

### (3)

Claimant urges that, whether or not the State is liable to claimant through its own actions, it is also vicariously liable for the negligence of Dr. Cally. Defendant vigorously opposes this argument on the ground that Dr. Cally was an independent contractor. This question—whether the State is liable for

---

1. We note that the proceedings and findings of the Hearing Committee may properly carry such evidentiary weight *(see,* Public Health Law § 230), unlike the recommendations of a medical malpractice panel convened pursuant to Judiciary Law § 148-a (8) *(Gross v Friedman,* 73 NY2d 721, 722-723).

the negligence of an independent contractor surgeon who performed an operation in an outside civilian hospital on a State prison inmate—appears to be a matter of first impression in this State.

The duty of the State at issue here is its duty to provide reasonable and adequate medical care to the inmates of its prisons. This duty arises both from the due process guarantees contained in the Federal and State Constitutions *(Estelle v Gamble,* 429 US 97, 103; *Powlowski v Wullich,* 102 AD2d 575, 587) and from statute—Correction Law § 70 (2) which directs DOCS to maintain and operate its correctional facilities "with due regard to * * * [t]he health and safety of every person in the custody of the department." *(See, Matter of La Rocca v Dalsheim,* 120 Misc 2d 697, 708.) It is well established that the State may be liable for civil damages for failure to carry out this duty. *(See, Matter of Von Holden v Chapman,* 87 AD2d 66, 68, and cases cited therein.)

It is clear that Dr. Cally is an independent contractor who was paid by the State on a per service-rendered basis. Under general principles of law, a principal is not liable for the torts of an independent contractor committed with respect to a third party—that is, there is no vicarious liability for the torts of an independent contractor, as distinguished from those of a servant. (Prosser and Keeton, Torts § 71, at 509 [5th ed].) However, certain exceptions to this rule, based primarily on public policy considerations, have been recognized.

Dean Prosser states that courts "have continued to repeat the 'general rule' of nonliability with exceptions, whose very number may be sufficient to cast doubt upon the validity of the rule." (Prosser and Keeton, *op. cit.,* § 71, at 510.) Another noted authority has commented "that the defense of independent contractor meets mounting disfavor * * * [and] has become suspect and there are those who would do away with it entirely." (2 Harper and James, Torts § 26.11, at 1403 [1956].) This commentator finds that the public policy rationale for one such class of exceptions are "situations wherein the law views a person's duty as so important and so peremptory that it will be treated as non-delegable. Defendants who are under such a duty '. . . cannot, by employing a contractor, get rid of their own duty to other people, whatever that duty may be.' " (2 Harper and James, *op. cit.,* § 26.11, at 1406, quoting *Hardaker v Idle Dist. Council,* [1896] 1 QB 335, 340.)

Such nondelegable duties may be established in a number of

ways and arise in a number of different situations. (2 Harper and James, *op. cit.,* at 1406; 3 NY Jur 2d, Agency, §§ 358-360, at 185-190; *see generally, Dorkin v American Express Co.,* 74 Misc 2d 673, 675, *affd* 43 AD2d 877.) As one authority has stated: "It is difficult to suggest any criterion by which the non-delegable character of such duties may be determined, other than the conclusion of the courts that the responsibility is so important to the community that the employer [or other principal] should not be permitted to transfer it to another." (Prosser and Keeton, *op. cit.,* § 71, at 512.)

One way in which a nondelegable duty may be imposed is by virtue of a special relationship that exists between two parties. A principal's (or actor's) duty to control the conduct of third persons, such as independent contractors, is set out in section 315 of the Restatement (Second) of Torts (1965), as follows:

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless * * *

"(b) a special relation exists between the actor and the other which gives to the other a right to protection."

Several types of such special relationships are listed in section 314 A, and one of these, clearly applicable to the case at bar, is formulated as follows: "(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other."

As set forth above, the State has a fundamental duty to provide its prisoners with reasonable and adequate medical care. Because the State has taken custody of these individuals in such a way as to deprive them of their normal opportunities for protection—including the opportunity to obtain medical treatment from private practitioners and the opportunity to select which physician will treat them—the State has a duty to control the conduct of third parties so as to prevent harm to its inmates.

This special relationship between the State and its prisoners is unaffected by an inmate's transfer to an outside facility for treatment. Correction Law § 23 (2) provides: "The commissioner of correction, in his discretion, may by written order permit inmates to receive medical diagnosis and treatment in outside hospitals * * *. Such inmates shall remain under the

jurisdiction and in the custody of the department while in said outside hospital and said superintendent or director shall enforce proper measures in each case to safely maintain such jurisdiction and custody."

The State is liable for the costs of outside medical treatment of an incarcerated inmate (1976 Atty Gen [Inf Opns] 196), and, in fact, paid Dr. Cally to perform the operation in question. Also, it is undisputed that in the instant case the State, not the claimant, selected Dr. Cally to perform the indicated surgery.

Thus, once the State undertakes to render a certain type of treatment (hernia repair) to an incarcerated inmate, it cannot, by engaging and paying an independent contractor, avoid liability for the negligent performance of those duties and responsibilities which are assumed by the independent contractor. Ergo, the State's duty, which arises from its special relationship to incarcerated inmates, is nondelegable and the State is vicariously liable for the negligence of the independent contractor in providing such medical care.

We are aware of only one reported case in any American jurisdiction that directly decides this precise question. In an en banc decision, *Shea v City of Spokane* (90 Wash 2d 43, 578 P2d 42, *affg* 17 Wash App 236, 242, 562 P2d 264, 267-268), the Washington Supreme Court adopted and affirmed the opinion of an intermediate appellate court, which stated: "When a city takes custody of a prisoner, it must provide health care for that prisoner * * *. This is a positive duty arising out of the special relationship that results when a custodian has complete control over a prisoner deprived of liberty. * * * It is evident to this Court that the nature of the relationship is such as to render non-delegable the duty of providing for the health of a prisoner. Stated another way, the duty is so intertwined with the responsibility of the City as custodian that it cannot be relieved of liability for the negligent exercise of that duty by delegating it to an 'independent contractor' physician." This holding in *Shea* has been cited with approval in other jurisdictions. *(See, e.g., Marek v Professional Health Servs.,* 179 NJ Super 433, 432 A2d 538, 544; *Fugate v Galvin,* 84 Ill App 3d 573, 406 NE2d 19, 21.)

In a somewhat different but clearly relevant context, the Appellate Division, Third Department, has recently held that the fact that a prisoner was treated by a non-State employee physician at a private hospital outside of the correctional

facility "is not dispositive of whether there was a relevant relationship involving Upstate [Medical Center], Samaritan [Hospital] and Ogdensburg [Correctional Facility] *(see, Cotto v City of New York,* 99 AD2d 748), especially since claimant could not be hospitalized without authorization from appropriate officials at Ogdensburg." *(Ogle v State of New York,* 142 AD2d 37, 40.) In this way, the Appellate Division recognized that the State could be implicated in the continuous treatment of an inmate at an outside hospital, especially where that inmate would not be at such private hospital without the authorization of prison officials. In a private context, it has also been held that a defendant who was under a duty to perform certain medical services is liable for the negligent performance of those services by the independent contractor physician with whom it contracted to perform the services. *(Mduba v Benedictine Hosp.,* 52 AD2d 450, 454.)

Thus, the application of time-honored theoretical legal analysis results in the conclusion that the duty of providing adequate medical care which is owed by DOCS to the inmates of its institutions arises from a particular special relationship which makes that duty nondelegable.[2] Consequently, the State cannot avoid responsibility for the negligent performance of that duty even when the performance is carried out by an independent contractor.

This result is supported by significant public policy considerations. If the State could be relieved of its critically important duty to provide reasonable and adequate medical care to incarcerated prisoners *(see, Estelle v Gamble,* 429 US 97, 103, *supra; Jones v Diamond,* 636 F2d 1364, 1378; *Lock v Jenkins,* 464 F Supp 541, 553, *mod on other grounds* 641 F2d 488; *Powlowski v Wullich,* 102 AD2d 575, 587, *supra)* by engaging independent contractors, would this not subvert the over-all duty and responsibility of government to incarcerated prisoners? Allowing the independent contractor defense to apply in this context could even immunize a State from any responsi-

---

2. Counsel for claimant urges that the State's duty is also nondelegable because it is imposed by statute. *(See,* 2 Harper and James, Torts § 26.11, at 1406; *Dorkin v American Express Co.,* 74 Misc 2d 673, 675.) While it is clear that certain statutes may impose such nondelegable duties *(see, Zimmer v Chemung County Performing Arts,* 65 NY2d 513 [Labor Law § 240]; *Allen v Cloutier Constr. Corp.,* 44 NY2d 290 [Labor Law § 241 (6)]), it is not so clear that this line of reasoning would apply to the instant facts and circumstances. However, it is not necessary to decide this issue in light of the court's holding that a special relationship exists.

bility for the conduct and operations of its entire prison system if the running of the State prison system was contracted out to private enterprise, as is the present practice in at least one western State.

On the basis of all the foregoing, the court finds that the State owed a nondelegable duty to claimant to provide adequate medical care, that the State delegated the performance of such duty to independent contractor physician Joseph Cally, and that the State is vicariously liable for the negligent manner in which Dr. Cally carried out the delegated task.

### EFFECT OF SETTLEMENT

Counsel for both parties have entered into a posttrial stipulation informing the court that claimant has settled his companion Supreme Court action against Dr. Joseph Cally for the sum of $25,000. This has prompted the defendant to urge in a posttrial memorandum that "the release and settlement of the independent contractor extinguishes any vicarious remedy" and that "the claimant has effectively released the State by releasing the sole wrongdoer." Although not articulated in this fashion, defendant apparently relies on the provisions of section 15-108 (a) of the General Obligations Law which provide that a release given to 1 of 2 or more tort-feasors liable for the same injury "reduces the claim of the releasor against the other tortfeasors" by, *inter alia,* "the amount of the released tortfeasor's equitable share of the damages". The State's argument must be that since it is only vicariously liable, the equitable share of Dr. Cally, the released tort-feasor, is 100% and, thus, its own vicarious liability could only be zero.

This exact argument was addressed by the Court of Appeals in *Riviello v Waldron* (47 NY2d 297, 306-307) where it held that "section 15-108 is meant to be read in conjunction with the contribution rights set forth in [CPLR] article 14 * * * [and] does not foreclose a plaintiff negligently injured by an employee from recovering against an employer on a theory of vicarious liability despite the plaintiff's prior execution of a release running to the negligent employee." *(See also, Glaser v Fortunoff,* 71 NY2d 643.) Therefore, claimant may continue to

pursue the instant claim against defendant.[3] However, the amount of claimant's settlement with Dr. Cally must be deducted from any judgment awarded claimant in the instant action. *(Mead v Bloom,* 94 AD2d 423, *affd* 62 NY2d 788; *Sutton v Piasecki Trucking,* 88 AD2d 617, *affd* 59 NY2d 800; *Siler v State of New York,* 31 Misc 2d 1.)

Claimant's injuries consist of the pain and risk attendant to undergoing unnecessary anesthesia and an unnecessary surgical operation, an abdominal scar, and an adverse psychological reaction which has interfered with his sleep in the past and which continues to prevent him from undergoing the still-needed left hernia repair. The court determines that claimant was damaged in the amount of $35,000; however, the amount of the prior settlement, $25,000, must be subtracted from this figure. Accordingly, the Chief Clerk is directed to enter judgment in favor of claimant in the amount of $10,000.

---

**3.** Contrary to defendant's contention, the court does not read *Mead v Bloom* (94 AD2d 423, *affd* 62 NY2d 788), which dealt with the effect of settlement on a third tort-feasor (i.e., not the vicariously liable principal), as overruling or altering the *Riviello v Waldron* (47 NY2d 297) holding.