**Katherine HERBERT, Appellant,**

v.

**DISTRICT OF COLUMBIA,
et al., Appellees.**

**No. 93–CV–407.**

District of Columbia Court of Appeals.

Argued Jan. 9, 1995.

Decided April 10, 1997.

---

Judy L. Feinberg, Washington, DC, with whom Andrea L. Koyner was on the brief, for appellant.

Edward E. Schwab, Assistant Corporation Counsel, with whom Vanessa Ruiz, Corporation Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corporation Counsel, and Michael F. Wasserman, Assistant Corporation Counsel at the time the brief was filed, were on the brief, for appellee District of Columbia.

Edward A. Gonsalves, Fairfax, VA, with whom Gary A. Godard and Christine Moug-

in–Boal were on the brief, for appellees Robert Yancey, M.D., and Barrington Barnes, M.D.

James W. Cobb, Washington, DC, filed a brief on behalf of appellees Professional Development Corporation and its officers and directors.

Before WAGNER, Chief Judge, and TERRY and SCHWELB, Associate Judges.

TERRY, Associate Judge:

The principal issue in this case, one of first impression in this court, is whether the trial court was correct when it ruled that the District of Columbia could delegate to a contractor its duty to provide necessary and appropriate medical care to prisoners incarcerated in its prison system. We hold that this ruling was erroneous, and thus we reverse the judgment in favor of the District and remand this case for further proceedings.

Appellant, Katherine Herbert, brought this suit against the District of Columbia, Professional Development Corporation (PDC), the directors and officers of PDC in their individual capacities, and PDC employees Robert Yancey, M.D., Barrington Barnes, M.D., and Charles Lawson, a physician's assistant. She sought to recover damages for injuries allegedly resulting from improper medical treatment which she received from Mr. Lawson while she was incarcerated in the District of Columbia Jail in July of 1987, and from the follow-up care provided by Drs. Yancey and Barnes. Before trial appellant moved for summary judgment against the District, arguing that it had a non-delegable duty to provide for the medical care of inmates in its prison system. This motion was denied. At the conclusion of the trial, the court directed verdicts in favor of the District, the directors and officers of PDC, and both Drs. Yancey and Barnes. Appellant noted this appeal, in which she challenges all of these rulings.[1] We affirm the directed verdicts in favor of the directors and officers of PDC and the two doctors. As to the District, however, we

---

1. The court also directed verdicts in favor of appellant against Charles Lawson and PDC itself.

Lawson and PDC have not cross-appealed from the judgments against them.

reverse the judgment and remand the case for further proceedings.

## I

### A. *Health Care Services at the District of Columbia Jail*

Early in 1986, the District and PDC entered into a one-year contract whereby PDC agreed to provide health care services for inmates at the D.C. Jail infirmary. Although this contract expired in 1987, PDC continued to render medical services at the infirmary under a month-to-month extension of the contract until January of 1988. Consequently, at all times relevant to this case, appellant was treated only by PDC personnel.

In the summer of 1987, PDC's performance of the contract was supervised primarily by two of its employees, Dr. Robert Yancey and Dr. Barrington Barnes. As Medical Director of the jail infirmary, Dr. Yancey oversaw all procedures by which medical services were provided to jail inmates. As Assistant Medical Director, Dr. Barnes was responsible for supervising the day-to-day operations of PDC personnel at the D.C. Jail. He also treated patients who had been admitted to the infirmary.

While the contract was in effect, the D.C. Jail infirmary was staffed by physicians, nurses, and physician's assistants, all employees of PDC. In general, the physicians would diagnose and prescribe treatment for inmates who were infirmary patients; the nurses would assist the physicians as needed in treating the patients; and the physician's assistants would provide basic health care and administrative services for both the physicians and the nurses (*e.g.*, administering prescribed medicines and monitoring patient admissions). While PDC was in charge of the infirmary, the physician's assistants were responsible for providing sixty to eighty percent of the medical care to infirmary patients.[2]

The performance of the contract with PDC was monitored and supervised by health care personnel employed by the District of Columbia Department of Corrections. Their personal observations were recorded in a series of evaluative reports, which were then forwarded to the Department. The contract included a requirement that PDC maintain malpractice insurance for all of its personnel working at the jail infirmary. Although the record is unclear on the particulars, it does show that, at the time of appellant's injuries, there was no insurance coverage for physician's assistant Charles Lawson.

### B. *Appellant's Injuries*

On July 16, 1987, while incarcerated at the D.C. Jail, appellant became ill and was admitted to the infirmary. There she exhibited symptoms of nausea and abdominal cramping secondary to withdrawal from narcotic addiction. For reasons not explained in the record, Lawson took charge of appellant and injected approximately fifty cc. of a dextrose or dextrose-and-sodium-chloride solution into each of her thighs. At trial, all parties stipulated that these injections were entirely unauthorized and constituted medical malpractice by Lawson.

As a result of these injections, appellant developed a condition in her thighs later diagnosed as cellulitis. The areas where she had been injected experienced significant swelling, redness, and blistering. At trial appellant testified that she had suffered debilitating pain and had substantially lost the use of both her legs.

After an investigation by Dr. Yancey, Lawson was found to have been responsible for appellant's injuries, and Dr. Yancey recommended that he be fired. Before that could be done, however, Lawson suffered serious head injuries in an automobile accident which left him unable to recall the specifics of his actions in treating appellant. At the time of trial, Lawson's whereabouts were unknown.

As appellant's attending physician, Dr. Barnes prescribed a treatment program consisting of compresses of warm water and hydrogen peroxide applied to the wounds on her thighs. She also received pain medication to alleviate her suffering. While staying at the infirmary, appellant was also ex-

---

2. In addition to staffing the infirmary, PDC maintained a relationship with the District of Columbia General Hospital for the provision of catastrophic health care to jail inmates.

amined by Dr. Yancey and by physicians from D.C. General Hospital's surgical clinic. During the course of her treatment, Dr. Yancey consulted with the hospital's Chief of Surgery about the possibility of transferring her to D.C. General. Eventually, however, Dr. Yancey concluded that appellant could be more effectively treated if she remained in the jail infirmary. Appellant received treatment at the infirmary as an inpatient until her release from jail on September 16, 1987. Three months later, on December 17, she filed this suit.

In the months that followed, appellant filed a number of amendments adding and deleting certain defendants. Before trial, she moved for summary judgment against the District, arguing that the District's duty to provide for the physical health of inmates incarcerated in its prison system was non-delegable, and that the District was liable for her injuries on a theory of negligence *per se.* The court denied the motion.[3]

## C. *The Trial*

Appellant's case was tried on several alternative theories:

1. That the District of Columbia, PDC, and PDC's corporate officers and employees (including Doctors Yancey and Barnes) were liable to appellant for their part in the negligent hiring of Charles Lawson, as well as for their failure to supervise his conduct adequately.

2. That Dr. Barnes committed malpractice in treating appellant for the injuries inflicted by Mr. Lawson, and that the remaining defendants were jointly and severally liable on that malpractice claim under the doctrine of *respondeat superior.*

3. That a master/servant relationship existed between the District and PDC, which made the District vicariously liable for the tortious acts of PDC and its employees.

4. That by allowing PDC to let its malpractice insurance on its employees lapse, the District had failed to supervise adequately the performance of its contract with PDC.

5. That the officers and directors of PDC had intentionally allowed the undercapitalization of the corporation and allowed its malpractice insurance coverage for its employees to lapse. Appellant argued that PDC's corporate veil should therefore be pierced, so that its officers and directors could be found personally liable for these tortious acts.

6. That appellant was a third-party beneficiary of the contract between the District and PDC, and thus had standing to pursue a claim of breach of contract.

At the end of the trial, all the defendants (except Lawson, who did not take part in the trial) moved for a directed verdict. The court granted all the motions except that of PDC. With respect to appellant's claim that she was a third-party beneficiary of the contract between the District and PDC, the trial judge noted that the pre-trial motions judge had ruled against appellant on this issue, adding that he would have ruled similarly on the basis of the evidence at trial. Appellant then moved for a directed verdict against PDC and Lawson and for an award of damages against them in the amount of $150,000. The trial judge granted that motion.

## II

In her motion for summary judgment, appellant argued that the District had a non-delegable duty to provide her with necessary medical care while she was confined in its prison system. In ruling on the motion, the court noted initially that the cases appellant cited in support of her position merely defined the duty owed by the District, but did not say whether it was delegable or non-delegable. The court then ruled that that "the District of Columbia has a non-delegable duty only insofar as the plaintiff has suffered a constitutional deprivation." Because appellant had not raised any such constitutionally based claim, the court denied her motion.[4]

---

3. Also before trial, a default was entered against Charles Lawson, with proof of damages to be presented during trial.

4. The court also rejected appellant's argument that the District was liable on a theory of negligence *per se.* Appellant does not contest this ruling.

In challenging this and similar rulings during the trial, appellant contends that the District does indeed have a non-delegable duty to provide appropriate medical care for inmates within its custody. She cites D.C.Code § 24–442 (1996), as well as case law from other jurisdictions, to support her argument that the District must be held liable when one of its prisoners is injured as a result of malpractice committed by prison health care providers, regardless of whether they are District employees or independent contractors. We agree with appellant and hold that the District's duty to provide reasonable, non-negligent medical care for prisoners in its custody is non-delegable.

## A. The District's Limited Constitutional Duty

The Supreme Court has held that federal and state governments have a non-delegable duty, based on the Eighth Amendment to the Constitution, to provide adequate medical care to persons incarcerated within their prison systems. *See West v. Atkins*, 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). Further, the Court has held that a private physician treating prison inmates under a contract with a state is a government agent, acting under color of authority sufficient to hold the state liable under federal civil rights statutes, such as 42 U.S.C. § 1983, for damages resulting from the physician's "deliberate indifference" to the medical needs of the inmates. *Id.* at 55–56, 108 S.Ct. at 2258–60. Such "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'... proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (citation omitted). Proof of such indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with treatment once pre-

scribed." *Id.* at 104–05, 97 S.Ct. at 291 (citations omitted).

■ With respect to medical treatment, however, "an inadvertent failure to provide adequate medical care cannot be said to constitute [a violation of the Eighth Amendment]." *Id.* at 105, 97 S.Ct. at 292. Although a state has a constitutional duty to provide for the "basic human needs" of anyone whose liberty it has restrained, and although medical care is included among those "basic human needs," *De Shaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989), the state also "has considerable discretion in determining the nature and scope of its responsibilities." *Youngberg v. Romeo*, 457 U.S. 307, 317, 102 S.Ct. 2452, 2459, 73 L.Ed.2d 28 (1982). What these and similar cases say, in essence, is that an allegation of medical malpractice alone will not support a claim that a prisoner's Eighth Amendment rights have been violated. Thus, to prove a constitutional violation in providing medical services, a prisoner must show conduct so extreme that it surpasses simple negligence. *See Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 705 (11th Cir.1985); *Henderson v. Harris*, 672 F.Supp. 1054, 1063 (N.D.Ill.1987) ("Contracting with private health services agencies will not relieve the federal government from its constitutional obligation" (citations omitted)).[5]

Although appellant occasionally refers in her brief to a possible constitutional duty on the part of the District, she makes no substantial Eighth Amendment claim, nor did she do so in the trial court. Instead, she appears to contend that the District has only a general, non-delegable duty to prevent the commission of simple medical malpractice on prisoners in its custody. If such a duty exists, therefore, it must be found outside the confines of the Constitution.

**5.** Appellant, citing *Henderson v. Harris, supra*, suggests that the District's duty to provide her with "appropriate" or "sufficient" medical care is not only non-delegable but constitutionally based. A careful reading of *Henderson* reveals, however, that it is a case of "deliberate indifference," as that term is used in *Estelle v. Gamble, supra*, rather than simple negligence as in the case at bar. *See Henderson*, 672 F.Supp. at 1058–1059.

## B. The District's Non–Constitutional Duty

 This court has held that the District, its agents and employees are subject to ordinary negligence standards requiring them to exercise reasonable care in the protection and safekeeping of inmates in its correctional facilities. *Matthews v. District of Columbia,* 387 A.2d 731, 734 (D.C.1978); *Gaither v. District of Columbia,* 333 A.2d 57, 60 (D.C.1975). These duties are codified in D.C.Code § 24–442, which states that the Department of Corrections is "responsible for the safekeeping, care, protection, instruction, and discipline of all persons committed to [its] institutions." However, even though prison personnel have a duty to exercise reasonable care, they are not insurers of an inmate's safety. *Hughes v. District of Columbia,* 425 A.2d 1299, 1302 (D.C.1981). Rather, in order to establish liability, a prisoner "must establish by competent evidence a standard of care; that the defendant violated that standard; and that such violation proximately caused injury to the [prisoner]." *Id.* With respect to medical care, we have held that physicians owe the same duty of care to prisoners in the District's custody that they owe to non-incarcerated patients. Thus, when treating prisoners, physicians are subject to ordinary negligence standards requiring them to exercise reasonable care. *District of Columbia v. Mitchell,* 533 A.2d 629, 648 (D.C.1987).

 The delegability of the District's duty to provide prison inmates with medical care and its potential liability when an independent contractor commits malpractice are questions currently unresolved in this jurisdiction. Indeed, there appear to be very few reported cases anywhere that address the delegability issue.[6] In at least two instances, however, courts have held governments liable for negligent medical care provided to prisoners by independent contractors on the ground that the government's duty to provide medical care to its prisoners is not delegable.[7]

In *Medley v. North Carolina Dep't of Correction,* 330 N.C. 837, 412 S.E.2d 654 (1992), the North Carolina Supreme Court held that the state was liable under its Tort Claims Act, N.C.G.S. § 143–291 (1990), for injuries resulting from malpractice committed by its agents when providing medical care to inmates. In that case a private physician, acting as an independent contractor for a state prison, misdiagnosed an inmate's affliction as an ingrown toenail when in fact he was suffering from diabetic gangrene in his left big toe. The toe was later amputated after another doctor discovered the gangrene, but the wound did not heal properly, and the prisoner's leg eventually had to be amputated above the knee.

On appeal, the court held that because of the state's position as the sole health care provider for its prisoners, and because the state had a duty to provide them with medical services, a duty imposed by both the United States and North Carolina Constitutions as well as a state statute,[8] the duty was of such importance as to make it non-delegable:

> We hold that the duty to provide adequate medical care to inmates … is such a fundamental and paramount obligation of the state that the state cannot absolve itself of responsibility by delegating it to another.

> The general policies, rules and regulations of the Department of Correction shall prescribe standards for health services to prisoners, which shall include preventive, diagnostic, and therapeutic measures on both an outpatient and a hospital basis, for all types of patients. A prisoner may be taken, when necessary, to a medical facility outside the State prison system. The Department of Correction shall seek the cooperation of public and private agencies, institutions, officials and individuals in the development of adequate health services to prisoners.

**6.** As the District points out, *Estelle v. Gamble, supra,* does not answer this question. It suggests that a prisoner who receives negligent medical care may sue for malpractice, 429 U.S. at 107 & n. 15, 97 S.Ct. at 293 & n. 15, but it does not say whether the state or the negligent physician is the proper party defendant, or whether the prisoner may elect to sue either (or both).

**7.** There is at least one case to the contrary, *Rivers v. State,* 159 A.D.2d 788, 552 N.Y.S.2d 189 (1990), but we do not find it persuasive.

**8.** N.C.G.S. § 148–19(a) (1991) provides in relevant part:

*Id.* at 844, 412 S.E.2d at 659. Consequently, the court said, "one with whom the [state] contracts to perform that duty is as a matter of law an agent for purposes of applying the doctrine of *respondeat superior.*" *Id.* (citations omitted). The court concluded that this rule "applies to the definition of 'agent' under the State Tort Claims Act" and thus held the state liable for the medical malpractice of an independent contractor who had been hired to provide medical services to state prisoners.

Although the District is statutorily required by D.C.Code § 24–442 to provide for the medical care of its prisoners, there is no District of Columbia tort claims act under which the District may be held liable as a principal for the negligence of its agents. However, the rationale of the *Medley* court is similar to that found in a case from the State of Washington that does not involve a tort claims act.

In *Shea v. City of Spokane,* 17 Wash.App. 236, 562 P.2d 264 (1977), *aff'd,* 90 Wash.2d 43, 578 P.2d 42 (1978), a prisoner suffered a serious spinal cord injury when he fell in his jail cell. He sued the city of Spokane for damages resulting from negligent medical treatment by a doctor who, under contract with the city, had examined him at the jail but failed to detect the severity of his injury. The Washington Court of Appeals held that the city had a non-delegable duty to provide prisoners in its jail with adequate health care, and that the negligence of the doctor in treating the prisoner must therefore be imputed to the city.[9] Because the prisoner, by being arrested, had been deprived of his ability to care for himself, the city had a duty to provide health care for him. That duty, the court held, was non-delegable because the city had "complete control" over the prisoner:

[T]he nature of the relationship [between the city and the prisoner] is such as to render non-delegable the duty of providing

for the health of a prisoner. Stated another way, the duty is so intertwined with the responsibility of the City as custodian that it cannot be relieved of liability for the negligent exercise of that duty by delegating it to an "independent contractor" physician.

*Id.* at 242, 562 P.2d at 268 (citations omitted).

■ We agree with the rationale of the *Medley* and *Shea* cases and adopt it for the District of Columbia. The District has a duty, imposed both by the Constitution [10] and by statute,[11] to provide medical care to prisoners incarcerated in its correctional system. Such confinement creates what the *Shea* court called a "special relationship," resulting from the fact that the District has "complete control over a prisoner deprived of liberty." *Shea, supra,* 17 Wash.App. at 242, 562 P.2d at 268; *see West v. Atkins, supra,* 487 U.S. at 57 n. 15, 108 S.Ct. at 2260 n. 15 ("prisons and jails are inherently coercive institutions that for security reasons must exercise nearly total control over their residents' lives"). A prisoner in need of medical care cannot choose the physician who will provide it; the prisoner must accept such care from the physician made available by the District or go without medical care entirely. The plain fact is that, once incarcerated, a prisoner's choice of a health care provider is forfeited to the District. "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle, supra,* 429 U.S. at 103, 97 S.Ct. at 290. Because the District has thus assumed the absolute right to make decisions about providing health care for the prisoner, it must also accept the consequences when those decisions go awry.

■ We conclude, as did the *Shea* court, that "the nature of the relationship" between the District and the prisoner—specifically, the prisoner's total dependency on the District to provide medical care—makes the Dis-

---

**9.** The Supreme Court of Washington later adopted in full "the analysis, rationale, and conclusion of the Court of Appeals" on this issue. 90 Wash.2d at 44, 578 P.2d at 42.

**10.** *De Shaney, supra,* 489 U.S. at 200, 109 S.Ct. at 1005–06; *West, supra,* 487 U.S. at 54, 108 S.Ct. at 2258.

**11.** D.C.Code § 24–442.

trict's duty non-delegable.[12] It "cannot be relieved of liability for the negligent exercise of that duty by delegating it to an 'independent contractor' physician." 17 Wash.App. at 242, 562 P.2d at 268 (citations omitted); accord, Medley, supra, 330 N.C. at 844, 412 S.E.2d at 659 ("the duty to provide adequate medical care to inmates ... is [so] fundamental ... that the state cannot absolve itself of responsibility by delegating it to another"). We hold, therefore, that the trial court erred in ruling that the District could delegate its duty to an independent contractor, and hence that it also erred in directing a verdict for the District. A corollary holding is that PDC and its employees are, "as a matter of law," agents of the District "for purposes of applying the doctrine of respondeat superior." See Medley, supra, 330 N.C. at 845, 412 S.E.2d at 659 (citations omitted).[13]

## III

■ Appellant next argues that she was entitled to a jury determination on the issue of whether she was a third-party beneficiary of the contract between the District and PDC, and that the court erred in directing a verdict against her on that claim. Specifically, she maintains that the District is liable to her for the failure of PDC to maintain its insurance coverage as required by their contract.

On the last day of trial, when ruling on the defendants' directed verdict motions, the trial judge (Judge King) said:

And, again, of course, what [the] presence or absence of insurance might do directly is in a contract where it was clear that the purpose of the insurance provision was for the benefit of third parties. Then ... the insurance might establish that a duty had arisen, but there is no evidence in this record of that. So, again, even if I were not bound by [Judge Shuker's] ruling as the law of the case, which I believe I am ... this is not a third-party beneficiary case.

When appealing from a trial court judgment, every appellant has a duty "to present this court with a record sufficient to show affirmatively that error occurred." Cobb v. Standard Drug Co., 453 A.2d 110, 111 (D.C.1982) (citations omitted). Since appellant has not made available to us the substance or rationale of Judge Shuker's pre-trial ruling, to which Judge King referred, we have no choice but to affirm the ruling of both judges on this issue.[14]

## IV

■ Appellant argues that the trial court erred in directing a verdict against her on her claim that the District negligently monitored PDC's performance of the contractual requirement that it provide insurance coverage for all of its employees. She relies on evidence that the directors of PDC met and frequently corresponded with District officials during the course of the contract to discuss PDC's progress in fulfilling this requirement. The fact that PDC never demonstrated to the District that all of its employ-

12. The Supreme Court in West v. Atkins, supra, likewise focused on this same relationship, not on whether the physician was a state employee or an independent contractor, in holding that the physician was acting "under color of state law" within the meaning of a federal civil rights statute:

Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the relationship among the State, the physician, and the prisoner. Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody.... [The doctor was] fully vested with state authority to fulfill essential aspects of [that] duty.... [The doctor] must be considered to be a state actor.

487 U.S. at 56–57, 108 S.Ct. at 2259–60 (emphasis added). Although West does not decide the precise issue before us, its reasoning is parallel to that of the Medley and Shea cases, which are directly in point.

13. The District, of course, would not be without a remedy against PDC or any such agent, either under common law principles of contribution or indemnity or, presumably, under the contract.

14. In any event, to the extent that we can discern the relevant facts from the record, appellant's third-party beneficiary claim appears to be without merit. See District of Columbia v. Campbell, 580 A.2d 1295, 1302–1303 (D.C.1990) (the District, as promisee of a contract, has no obligation to a third party to ensure that the promisor fulfills its contractual duty).

ees were in fact insured, appellant contends, created a jury issue. We find no error.

When directing a verdict for the District on this issue, the trial court stated:

> The evidence we have is that there were ongoing efforts [by the District] at monitoring and controlling the way this contract was administered. And in the absence of some expert opinion that would tell us what it is that is expected, in what way the District's efforts in this case fell down, there is simply no way for a jury, not using speculation, to conclude that the District failed to monitor this contract in a way which proximately caused the incidents complained.

In other words, since the evidence showed that the District was in fact monitoring PDC's progress in insuring its employees, expert testimony was required to establish the standard of care that applied to the District's monitoring and to show how that standard was breached. Because appellant presented no such testimony, the court correctly withdrew this claim from the jury.

■ Expert testimony about the applicable standard of care is required when an issue in dispute is beyond the common knowledge and experience of the average lay person. *E.g., Rajabi v. Potomac Electric Power Co.,* 650 A.2d 1319, 1322 (D.C.1994); *Otis Elevator Co. v. Tuerr,* 616 A.2d 1254, 1257 (D.C.1992). In the instant case, the monitoring by the District of PDC's compliance with the terms of the contract is a subject with which the average lay person would not be familiar. *See Rajabi, supra,* 650 A.2d at 1322; *Toy v. District of Columbia,* 549 A.2d 1, 6 (D.C.1988); *Matthews v. District of Columbia, supra,* 387 A.2d at 734–735 (expert testimony required to establish

standard of care in matters affecting Department of Corrections procedures). By appellant's own admission, during the course of the dealings between the District and PDC, the District continually monitored and reviewed PDC's performance and adherence to the terms of the contract. Thus, in the face of what appears to have been responsible conduct, appellant bore the burden of producing expert testimony to establish the applicable standard of care and a breach of that standard. Her failure to do so is fatal to her claim. *See Meek v. Shepard,* 484 A.2d 579, 582 (D.C.1984) (without sufficient proof of standard of care, case may not go to the jury).

■ Appellant's contention that the trial court erred in directing a verdict for Dr. Yancey, on her claim that he was negligent in his supervision of Mr. Lawson, must fail for the same reason. When ruling for Dr. Yancey on this issue, the court noted that there had been no expert testimony on the standard of care applicable to the supervision of medical personnel. Since no standard was proven, the jury was necessarily incapable of determining whether any breach occurred, and a directed verdict was required. *Meek v. Shepard, supra.*[15]

## V

■ The trial court directed a verdict for the individual officers and directors of PDC, ruling that they were not personally liable for the acts committed by the corporation in the performance of its contract with the District.[16] Appellant contends that there was sufficient evidence of fraud on the part of the officers and directors to justify piercing PDC's corporate veil, or alternatively to hold them personally liable as tortfeasors acting

---

**15.** In any event, Dr. Yancey testified without contradiction that he had confirmed that Lawson was covered by malpractice insurance at the time he was hired by PDC. After this initial check, Dr. Yancey said, the maintenance of insurance coverage for PDC employees was the sole responsibility of the corporate officers. Yancey was not an officer but only an employee, and thus he could not have been liable.

**16.** Of the six arguments presented in the brief filed by PDC and its officers and directors, we may consider only two: (1) that the trial court

was correct in ruling that the officers engaged in no misconduct for which they might be found personally liable, and (2) that the court was correct in ruling that appellant was not a third-party beneficiary of the contract between the District and PDC. The remaining four arguments urge us to reverse a number of other rulings made by the trial court. Since PDC and its officers and directors never noted a cross-appeal, however, these additional claims are not properly before us, and we do not address them.

in the name of the corporation. In particular, appellant argues that the officers and directors of PDC intentionally refrained from insuring all of its employees, in violation of its contract with the District, and then allowed its corporate coffers to become so undercapitalized as to render itself judgment-proof. This conduct by PDC's officers and directors, appellant maintains, directly harmed her and thus makes them personally liable for their actions.

It is true, of course, that corporate officers may be found individually liable "for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." *Vuitch v. Furr*, 482 A.2d 811, 821 (D.C.1984) (citations omitted); *see Camacho v. 1440 Rhode Island Avenue Corp.*, 620 A.2d 242, 246–248 (D.C. 1993). In this case, however, as the trial court ruled, there was no showing that the officers and directors of PDC engaged in any such fraudulent activity as appellant alleged. At best, the evidence was ambiguous as to the financial health of the corporation, and there was no proof at all that PDC had been intentionally undercapitalized; on the contrary, the capitalization requirements imposed by law on District of Columbia corporations were fully met. Appellant offered no evidence regarding the manner in which the officers and directors of PDC conducted its corporate affairs. We have said on many occasions that fraud "must be established by clear and convincing evidence, which is not equally consistent with either honesty or deceit." *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). The evidence in this case, even when viewed in the light most favorable to appellant, does not meet this standard.

## VI

Finally, appellant contends that the trial court erred in directing a verdict for Dr. Barnes on her medical malpractice claim against him. Again, we find no error.

Appellant asserts that Dr. Barnes committed malpractice by simply applying warm compresses and hydrogen peroxide to her injuries instead of following a more specialized form of therapy. She relies on the testimony of her expert, Dr. Macy Hall, that Dr. Barnes' treatment aggravated the injuries she had suffered at the hands of Mr. Lawson. On cross-examination, however, Dr. Hall admitted that he was unsure of this:

Q. . . . . But you can't say in this case whether it made it worse or not; is that right?

A. I wasn't there. I can't say.

Q. Do you agree with me, in this case you can't say whether it made it worse or not?

A. No.

In addition, as the trial court observed in granting the directed verdict, Dr. Hall had no idea of the specifics of Dr. Barnes' treatment program other than the fact that it involved the application of warm compresses and hydrogen peroxide. Dr. Hall admitted that this information alone was insufficient to enable him to render an expert opinion on the propriety of the treatment program. In addition, he conceded that if the blistering and cellulitis were present on appellant's thighs before the compresses were applied (as the medical records and photographic evidence showed), then Dr. Barnes' treatment could not have caused the blistering and cellulitis. Thus the court concluded that there was no evidentiary foundation for a finding of malpractice by Dr. Barnes. That ruling was plainly correct. *See, e.g., Gordon v. Neviaser*, 478 A.2d 292, 296 (D.C.1984) (no evidence that treatment aggravated pre-existing injury; directed verdict for doctor affirmed).[17]

## VII

We therefore affirm the trial court's judgment in favor of the officers and directors of PDC, as well as Dr. Yancey and Dr. Barnes. We also affirm the judgments against PDC itself and Charles Lawson, which are not challenged on appeal. We reverse the judgment in favor of the District and remand this

---

17. Because we agree that there was insufficient evidence of malpractice by Dr. Barnes, we necessarily reject appellant's *respondeat superior* claims against PDC and Dr. Yancey based on Dr. Barnes' alleged negligence.

case for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part, and remanded for further proceedings.*

SCHWELB, Associate Judge, concurring in part and dissenting in part:

I agree that the District of Columbia and its agents must exercise due care in addressing the health needs of persons confined in the District's correctional institutions. In holding that this duty is "non-delegable," however, the court is effectively imposing liability upon the District without requiring proof of fault. Under the "non-delegable duty" doctrine, the District must compensate the plaintiff even if all District employees have exercised due care in the selection of a health care provider and even if the District's own conduct has been in all respects free of negligence. I do not believe that the District should be held liable for the negligence of another over whose activities the District had no control.

I agree that the judgment should be reversed, however, because in my view, Ms. Herbert presented sufficient evidence to permit an impartial jury to find that the District failed to comply with the applicable standard of care. More particularly, the District's failure to require from PDC proof that PDC had obtained liability insurance coverage for its employees could fairly be viewed as negligent, and I believe that the issue is one which the jury could properly decide without the presentation of expert testimony.

## I.

Turning first to the question of "non-delegable" duty, it is important to note at the outset that we are not dealing here with the District's affirmative constitutional responsibilities vis-a-vis prisoners in its custody. The Supreme Court has held that "the State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated." *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, ·101 L.Ed.2d 40 (1988) (citation omitted). Moreover, this constitutional obligation is non-delegable:

Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights.

*Id.* at 56, 108 S.Ct. at 2259 (footnote omitted).

The present case, however, does not involve the kind of conduct which gives rise to an Eighth Amendment claim. The defendants are alleged to have been negligent, not cruel. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). As my colleagues explicitly recognize, "an inadvertent failure to provide adequate medical care cannot be said to constitute a violation of the Eighth Amendment." Maj. op. at 1180 (quoting *Estelle v. Gamble,* 429 U.S. 97, 105, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976)). Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. *Estelle, supra,* at 106, 97 S.Ct. at 292. On the contrary, a plaintiff seeking to establish a constitutional violation must prove "deliberate indifference to a serious medical need." *Id.*

To hold that the duty not to be cruel or wanton or obdurate cannot be delegated away is one thing; to expand that doctrine to make the District liable for the ordinary negligence of a contract health care provider, without proof of lack of due care on the part of the District, is quite another. "The [District] is not an insurer of the safety of a prisoner," *Matthews v. District of Columbia,* 387 A.2d 731, 734 (D.C.1978); see also maj. op. at 1180–81; or, by analogy, of the prisoner's health. The majority's ruling in Ms. Herbert's favor, however, effectively makes the District the guarantor of satisfactory performance by PDC and its employees, even though the District has no control over that performance in a given case. Moreover, the majority decision imposes liability without fault upon the District (and thus on the taxpayers) by judicial *fiat* and without legislative sanction.

Whether the "non-delegable duty" doctrine applies to cases such as this one is a question of first impression in this jurisdiction. The majority cites two state court decisions in support of its position, but neither persuades me that this doctrine should be expanded beyond its constitutional moorings in the Cruel and Unusual Punishment Clause.

The earlier of these cases, *Shea v. City of Spokane*, 17 Wash.App. 236, 562 P.2d 264 (1977), *aff'd*, 90 Wash.2d 43, 578 P.2d 42 (1978), contains broad language, some of which is quoted by Judge Terry, see maj. op. at 12,[1] supporting Ms. Herbert's position on the question of non-delegable duty. The facts of *Shea*, however, are quite different from, and far more extreme than, those in the present case. Shea, then twenty years old, became ill while incarcerated for driving while intoxicated. The jailer denied him permission to call a doctor to request medication. Shea became dizzy and fell, sustaining a severe spinal injury. Later, in great pain and incontinent, he was placed in a padded cell with no toilet or water and kept there for almost two days. The jail doctor, a physician with whom the City had a contract, diagnosed Shea as suffering from alcohol withdrawal. The doctor failed to detect the spinal injury. Ultimately, Shea was examined at a hospital, and it was determined that he had sustained various permanent injuries, including partial and total paralysis. 17 Wash.App. at 237–40, 562 P.2d at 265–66.

The intermediate appellate court decided *Shea* four months after the Supreme Court's decision in *Estelle v. Gamble, supra.* In *Estelle*, the Supreme Court had held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain ... proscribed by the Eighth Amendment." 429 U.S. at 104, 97 S.Ct. at 291 (citation and internal quotation marks omitted). The facts of *Shea* bring to mind the language of *Estelle*. The court's expansive articulation of the City's non-delegable duty was written in response to a record that at least arguably reflected conduct a good deal more serious than simple negligence. There was substantial evidence of deliberate indifference by the City to Shea's medical needs. *See Estelle, supra*, 429 U.S. at 104–05, 97 S.Ct. at 291–92. Such deliberate indifference amounts to a constitutional violation which the State has a non-delegable duty to avoid. *See West, supra*, 487 U.S. at 55, 108 S.Ct. at 2258–59.

Concededly, the court's rationale in *Shea* did not depend on a showing of a constitutional wrong. "It is well to remember, [however], that significance is given to broad and general statements of the law only by comparing the facts from which they arise with those facts to which they supposedly apply." *Kraft v. Kraft*, 155 A.2d 910, 913 (D.C.1959). In *Shea*, the plaintiff suffered harm for which the City of Spokane was demonstrably at fault. I am reluctant to invoke that decision here to impose liability on the District on a theory which does not require a showing of fault.

The second decision on which the majority relies is *Medley v. North Carolina Dep't of Correction*, 330 N.C. 837, 412 S.E.2d 654 (1992). In *Medley*, the court held that the State was liable to a prisoner under North Carolina's Tort Claims Act (NCTCA), as well as under the State and Federal Constitutions and the common law,[2] for harm sustained as a result of the negligence of a private physician.[3] The court based its decision on the theory that the State's duty to provide medical care to persons confined in its correctional institutions was non-delegable.

In reaching this conclusion, the court drew an analogy between the State's duty to its prisoners and the obligation of a father to provide for his minor children, "a duty he

---

1. The court also stated that the City's duty must go beyond the mere exercise of ordinary care in the selection of a jail physician as contended by defendant. Rather, the City's liability includes the negligence of the jail physician because the duty to keep the prisoner in health is non-delegable.

17 Wash.App. at 242, 562 P.2d at 268.

2. In light of the court's construction of the NCTCA, the discussion of the State's constitutional and other non-statutory obligations appears to be dictum.

3. Like PDC in this case, the physician had been engaged to treat prisoners pursuant to a contract with the Department of Corrections.

may not shirk, contract away, or transfer to another." *Id.* at 847, 412 S.E.2d at 657 (quoting *Ritchie v. White*, 225 N.C. 450, 35 S.E.2d 414, 415 (1945)). The court indicated that if the father cannot avoid his obligation by delegating it, so too the State cannot escape liability by contracting with a private physician. *Id.*

This analogy may be an apt one, but it compels a conclusion opposite to the one reached by the court. Questions of parental immunity aside, we may assume that a father who observes that his child is seriously ill may not lawfully "shirk" his obligation to take the child to a doctor or to the hospital. If the father promptly employs a physician of acceptable reputation, however, he has done all that he reasonably can do. The father does not become personally liable to his child for injuries sustained because an apparently reputable physician performed the job incompetently and failed to comply with the applicable standard of care. Just as the father cannot fairly be faulted for the negligence of a doctor whom he has reasonably chosen to treat his child, so, too, the District ought not to be held liable for a mistake made by a health care provider in the absence of any showing that the provider was negligently selected.[4]

In *Rivers v. State*, 159 A.D.2d 788, 552 N.Y.S.2d 189 (3d Dept.1990), a surgeon performed a hernia operation on a prison inmate. The inmate alleged that the surgery had been negligently performed. The State did not employ or even select the surgeon, although the State's referring doctor knew that the surgeon performed operations at the hospital in question. The trial court, relying

in substantial part on the decision in *Shea*, held that the State was liable for the surgeon's negligence on the theory that the State's duty to provide health care to the inmate was non-delegable and that the surgeon's failure to exercise due care was attributable to the State. *Rivers v. State*, 142 Misc.2d 563, 537 N.Y.S.2d 968, 971–74 (Ct. Claims 1989). The appellate court reversed, holding that the State should not be held to be "the guarantor of the adequacy of medical services under all circumstances, including those beyond its control." 552 N.Y.S.2d at 189. The court went on to state that the rule applied by the trial court would

> lift prisoners' rights vis-a-vis malpractice beyond the rights afforded to all others. Claimant's status as a prisoner and his impaired ability to make health-related decisions totally on his own hardly justifies such an extreme result in terms of the State's responsibility.... [T]he premise for imputing liability is the element of control. We consider that rationale the appropriate test of responsibility.

*Id.* at 189–90 (citation omitted). Noting that the surgeon was an independent contractor and that no negligence was established on the part of the State, the court concluded that the State was not responsible for Rivers' injuries. *Id.* at 190.

I agree with the appellate court's analysis in *Rivers.*[5] Here, we are being asked to award damages against the District in the absence of proof of negligence or wrongful conduct on the District's part. Liability without fault is the exception rather than the rule, and I do not believe that we should take the formidable step of imposing such liability

---

**4.** Ms. Herbert relies heavily on *Henderson v. Harris*, 672 F.Supp. 1054 (N.D.Ill.1987). In *Henderson*, the court held that the United States may be held liable to a federal prisoner for negligent medical treatment by a private health care provider because "a jailer's duty to provide reasonable medical care is non-delegable." *Id.* at 1063 (citation omitted). The analysis in *Henderson* is unpersuasive, however, because the court appeared to refer interchangeably to the constitutional duty to avoid cruel and unusual punishment and the common law obligation to exercise reasonable care. The court stated, for example, that the United States was potentially liable for "alleged *negligence*" because, *inter alia*, "[c]ontracting with private health service

agencies will not relieve the federal government from its *constitutional* obligation." *Id.* (Emphasis added.) The Supreme Court has held, however, that there is no constitutional right to non-negligent medical treatment. *Whitley, supra*, 475 U.S. at 319, 106 S.Ct. at 1084.

**5.** I acknowledge, however, that *Rivers* is one step removed from this case. There, the doctor at the correctional facility, whose position roughly corresponded to that of PDC, referred the plaintiff to the surgeon who was alleged to have been negligent. In the present case, PDC and its agent, Charles Lawson, were the negligent parties, and not simply parties who referred the prisoner to a negligent actor.

upon the District and its taxpayers without specific legislative authorization. Accordingly, I do not agree that Ms. Herbert can prevail on a theory of non-delegable duty.

## II.

I have attempted to demonstrate that the District has a right to contract with a private health provider like PDC without subjecting itself to liability without fault for the negligence of a PDC employee in a given case. The obvious corollary to that proposition, however, is that the District must exercise due care in selecting and, where appropriate, in supervising the activities of those to whom it has entrusted the health of the prisoners in its custody. A resident of the District of Columbia Jail or of Lorton can do little to protect his or her interests against an unsympathetic health care provider. Courts should not be satisfied with superficial or token compliance by the District with its responsibilities in this area.

In the present case, the contract between PDC and the District required PDC to provide liability insurance coverage for all of PDC's employees. This requirement makes eminent sense, for without it the prisoner has no meaningful recourse if PDC does not do its job properly. PDC never demonstrated to the District, however, that all of its employees were insured. At the time of Ms. Herbert's injuries, there was no insurance coverage for Charles Lawson, the physician's assistant who committed the malpractice which resulted in Ms. Herbert's injuries. As a result of the lack of coverage, Ms. Herbert's judgment against Lawson is apparently worthless.

Ms. Herbert contends that the District violated the applicable standard of care by not enforcing the terms of the contract and requiring proof of coverage. My colleagues respond that the District did take some steps to monitor PDC's performance, and that, under all of the circumstances, Ms. Herbert was required to adduce expert testimony. According to the majority, "the monitoring by the District of PDC's compliance with the terms of the contract is a subject with which the average lay person would not be familiar." Maj. op. at 16 (citations omitted).

Although the question is a close one, I do not agree that expert testimony was required. "Where negligent conduct is alleged in a context which is within the realm of common knowledge and everyday experience, the plaintiff is not required to adduce expert testimony either to establish the applicable standard of care or to prove that the defendant failed to adhere to it." *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 200 (D.C.1991). To be sure, "courts should not leave it to a jury of tailors and haberdashers to pass judgment [unaided by expert testimony] on how to make a wet and rolling deck in a seaway a safe place to work." *Id.* (quoting *Zinnel v. United States Shipping Bd. Emergency Fleet Corp.,* 10 F.2d 47, 49 (2d Cir. 1925) (dissenting opinion)). Juries, in other words, ought not to be permitted to speculate about subjects which are not readily understandable by lay persons without expert assistance.

We are not dealing here, however, with especially complicated esoterica. The genius of the jury system is that ordinary citizens are usually endowed with that most precious of qualities, common sense. In my opinion, they are intelligent enough to determine on their own whether it was reasonable for the District to delegate responsibility for the health of its prisoners to a company like PDC without first insisting on proof of insurance coverage—whether, to put it bluntly, the District should have required performance, not promises; deeds, not words. In their daily lives, jurors frequently confront the question whether it makes sense to trust someone rather than to make him demonstrate his credit or qualifications or to provide written references. The task in this case ought not to be beyond them.

## III.

For the foregoing reasons, I would decline to hold the District liable on the basis of

breach of a "non-delegable" duty. I would, however, reverse the judgment in favor of the District and remand the case for further proceedings consistent with the law as set forth in this opinion. Except as specifically noted, I join the opinion of the court.